# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 13, 2021

Lyle W. Cayce
Clerk

No. 20-50548

Blakely Turner; Damon Brooks; Deandra Simpson; Shamiyan Walton; Michael Harris; Anita Simpson,

*Plaintiffs—Appellants*,

Charles Levy,

*Intervenor—Appellant*,

*versus*

Cincinnati Insurance Company,

*Defendant—Appellee*.

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 6:19-CV-642

---

Before Higginbotham, Southwick, and Engelhardt, *Circuit Judges*.

Leslie H. Southwick, *Circuit Judge*:

After obtaining a default judgment in state court against defunct entities, six plaintiffs filed this coverage action to collect on that judgment from the entities' insurer. The district court granted summary judgment to the insurer on two grounds. First, it determined that the Plaintiffs lacked

standing to sue the insurer without either an adversarial judgment against the entities or a valid assignment from the entities. Second, it determined that the Plaintiffs' claims against the entities fell outside the scope of the entities' liability insurance coverage. We disagree with the district court on the first ground but agree on the second. Accordingly, we AFFIRM.

FACTUAL AND PROCEDURAL BACKGROUND

A company with trade schools in several Texas counties has been the subject of multiple similar lawsuits brought by former students who have claimed the schools were a failure in various ways. The outcome of this appeal will turn on whether the suits that were filed before the insurance-coverage period are based on the same wrongful acts as the acts alleged in the current suit – which was filed during the policy period. If any of the prior suits are based on the same wrongful acts as the later one, then a policy limitation that denies coverage when the relevant claims are not *first* made against the insured during the policy period apples.

Now, some of the details. Cincinnati Insurance Company issued a claims-made liability insurance policy to the directors and officers of Ability Holdings, Inc., ATI Enterprises, Inc., and ATI Acquisition Company (collectively, "ATI"). The policy included up to $10 million in liability coverage for claims "first made" during the "policy period" against ATI's directors and officers for a "wrongful act."[1] The relevant policy period was December 30, 2010 to December 30, 2011.

---

[1] The coverage provision stated: "We will pay on behalf of the 'company' all 'loss' which the 'company' is required to pay as indemnification to the 'individual insureds' resulting from any 'claim' first made during the 'policy period' . . . for a 'wrongful act'." The term "loss" includes defense costs and indemnification costs.

Under the policy, a "wrongful act" is "any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted or allegedly committed or attempted." Multiple acts constitute "interrelated wrongful acts" if they "have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events, or transactions." Further, "all 'claims' based upon or arising out of the same 'wrongful act' or any 'interrelated wrongful acts' shall be considered a single 'claim'." A claim is considered "first made" at the moment "notice of the earliest 'claim' arising out of such 'wrongful act' or 'interrelated wrongful acts' is received in writing by [ATI] or by [Cincinnati], whichever comes first." The limitation that the policy covers only claims first made during the policy period is relevant to this appeal because the district court determined that the underlying lawsuit against ATI was sufficiently related to another lawsuit filed against ATI prior to the policy period, such that the two lawsuits constitute a single coverage claim first made prior to the period of coverage.

In addition to that limitation, the policy also contains several exclusions. One is an exclusion for prior notice of a claim that applies when a new claim is "[b]ased upon, arising out of, or in consequence of, or in any way involving" any wrongful act, interrelated wrongful act, or other fact that was the subject of notice prior to the policy period. Another is the prior/pending litigation exclusion, which applies when a claim is "[b]ased upon, arising out of, or in consequence of, or in any way involving any prior and/or pending litigation as of [December 30, 2010,] or any fact, circumstance, situation, transaction or event underlying or alleged in such litigation, regardless of the legal theory asserted in such 'claim'."

With these exclusions in mind, we examine the relevant facts. ATI operated trade schools across Texas from 2009 to 2011. On February 8,

2010, former students sued ATI[2] in Dallas County, Texas. *See Nelson v. ATI Enters., Inc.*, No. DC-10-01479-I, 162nd District Court of Dallas County, Texas ("*Nelson* lawsuit"). That lawsuit alleged that ATI misrepresented the quality and results of its programs through its website, promotional materials, and admissions representatives; that ATI pressured its admissions representatives to increase enrollment by engaging in aggressive and misleading sales techniques; that its schools were overcrowded; that ATI suffered from "chronic shortages of qualified instructors"; and that the facilities and equipment at the Dallas campus were inadequate. The *Nelson* lawsuit sought relief under Section 17.46(b) of the Texas Deceptive Trade Practices Act, and under theories of common-law fraud, fraud by nondisclosure, and unjust enrichment.

On June 29, 2010, the *Nelson* plaintiffs filed a First Amended Petition, which apparently added more plaintiffs. Around that time, the *Nelson* lawsuit was submitted to arbitration. Six of the *Nelson* plaintiffs did not participate in arbitration. Those six "non-arbitration plaintiffs" filed a Second Amended Petition that added Ability Holdings, Inc. as a defendant and added claims for breach of contract and breach of warranty. Because the arbitration resulted in an award for the participating plaintiffs, the state court in March 2013 severed the claims of the non-arbitration plaintiffs and assigned them a new case number. *Harper v. ATI Enters., Inc.*, No. DC-13-02560, 162nd Judicial District Court of Dallas County, Texas ("*Harper* lawsuit"). The *Harper* plaintiffs then filed a Third Amended Petition.

On October 14, 2011, 107 former students (including the 6 former students who are appellants now) sued ATI in McLennan County, Texas. *See Bartlett v. ATI Enters.*, No. 2011-4333-4, 170th Judicial District Court of

---

[2] The original *Nelson* petition did not include Ability Holdings, Inc. as a defendant.

No. 20-50548

McLennan County, Texas ("*Bartlett* lawsuit").   The allegations in the *Bartlett* lawsuit are virtually identical to the allegations in the *Nelson* lawsuit. As in the *Nelson* lawsuit, the *Bartlett* lawsuit alleged that ATI misrepresented the quality and results of its programs through its website, promotional materials, and admissions representatives; that ATI pressured its admissions representatives to increase enrollment through aggressive and misleading sales techniques and tactics; that its schools were overcrowded; that overcrowding led to "chronic shortages of qualified instructors"; and that the schools lacked access to necessary equipment and supplies.[3]  The *Bartlett* lawsuit sought relief under the Texas Deceptive Trade Practices Act, and under theories of common-law fraud, fraud by nondisclosure, unjust enrichment, breach of contract, and breach of warranty.  This appeal arises collaterally from those six plaintiffs' efforts to prosecute the *Bartlett* lawsuit and collect on the judgment they obtained against ATI.

As of November 11, 2011, after the *Bartlett* lawsuit commenced, Cincinnati assumed the defense of ATI, while reserving its rights to challenge or deny coverage.  Several months later, Cincinnati learned about the *Nelson* lawsuit in Dallas County.  On July 25, 2012, Cincinnati sent a letter to ATI that denied all coverage for the *Bartlett* lawsuit and explained its reasons for doing so.  According to the letter, Cincinnati had concluded: (1) that the *Nelson* lawsuit and the *Bartlett* lawsuit were "based upon the same Wrongful Acts and/or Interrelated Wrongful Acts," meaning that the two lawsuits constituted a single claim first made against ATI prior to the period of policy coverage; (2) that the prior/pending litigation exclusion precluded coverage; and (3) that the prior notice exclusion also precluded coverage.

---

[3] The only noticeable difference between the two petitions is that the *Nelson* lawsuit included a few allegations directed specifically at ATI's Dallas campus, while the *Bartlett* lawsuit did not make any allegations facially attributable only to the Waco campus.

On January 21, 2014, ATI filed for Chapter 7 bankruptcy, which stayed the *Nelson* lawsuit, the *Bartlett* lawsuit, and several others pending against ATI. On January 29, 2016, ATI's bankruptcy trustee filed a coverage action against Cincinnati and other insurance companies in Dallas County. During discovery for the coverage action, and after a trial date had been set, the trustee and Cincinnati executed a settlement-and-release agreement for the ATI bankruptcy estate's claims against Cincinnati. ATI's bankruptcy estate agreed to release and discharge Cincinnati from liability "arising out of, or related to" the coverage lawsuit, the former-student lawsuits, and the insurance policy. The bankruptcy court approved the settlement on June 20, 2017.

On July 25, 2018, despite the settlement and release, three sets of plaintiffs moved to have the bankruptcy court lift the automatic stay so that they could prosecute claims against Cincinnati and another insurance company. Those plaintiffs included former-student plaintiffs in the *Nelson* lawsuit who did not participate in arbitration, former-student plaintiffs in the *Bartlett* lawsuit, and a former-employee plaintiff who had filed a discrimination action against Cincinnati. Cincinnati objected to the relief-from-stay motion, arguing that the plaintiffs had fully released Cincinnati through its earlier settlement-and-release agreement. Over Cincinnati's objection, the bankruptcy court granted the various plaintiffs' collective motion for relief from the stay. The court remarked that it was not ruling on, among other things, the scope of the settlement-and-release agreement or as to whether the plaintiffs were entitled to recover from Cincinnati, *i.e.*, whether any coverage defenses applied.

After the stay was lifted, six of the *Bartlett* lawsuit plaintiffs — Blakely Turner, Michael Harris, Anita Simpson, Deandra Simpson, Shamiyan Walton, and Damon Brooks — began to move forward with their claims against ATI in McLennan County. (From this point, we will use "Plaintiffs"

to refer to these six individuals, who are the appellants).  The state court severed these Plaintiffs' claims from the rest of the *Bartlett* lawsuit and assigned them a new case number.  On June 6, 2019, the state court called the Plaintiffs' case to trial.  ATI did not appear at trial or provide any defense. The state court entered a default judgment in favor of the Plaintiffs in the amount of $1,662,200.00 on June 19, 2019, which included several forms of damages as well as costs and attorneys' fees.

Then, on September 20, 2019, the Plaintiffs filed this lawsuit against Cincinnati, originally in state court in McLennan County, seeking recovery on ATI's insurance policy.  The state-court petition asserted a claim against Cincinnati for breach of contract.  The Plaintiffs claimed that "as judgment creditors of" ATI, they were "entitled to enforce Defendant Cincinnati's obligations under the insurance contract."  Cincinnati removed the case to the Western District of Texas, then unsuccessfully tried to transfer venue to the Northern District of Texas.

The Plaintiffs filed a motion for partial summary judgment, arguing that Cincinnati wrongfully breached its duty to defend ATI.  They also made clear that they sought trial in which Cincinnati would defend ATI's interests, so that the Plaintiffs could prove Cincinnati's duty to indemnify ATI and then access the insurance-policy funds.

Cincinnati cross-moved for summary judgment with three arguments. First, it argued that the Plaintiffs lacked standing to bring a direct action against Cincinnati without either an adversarial judgment against ATI or a valid assignment from ATI.  Second, it argued that ATI released its claims against Cincinnati through the settlement-and-release agreement approved by the bankruptcy court.  Third, it argued that the Plaintiffs' lawsuit against ATI was not covered by ATI's insurance policy with Cincinnati because it

was not a claim first made during the policy period and several other exclusions applied.

On March 12, 2020, the district court denied the Plaintiffs' partial motion for summary judgment and granted summary judgment for Cincinnati for two reasons. First, it determined that the Plaintiffs lacked "standing" to bring a direct action against Cincinnati, their wrongdoer's insurer, because they had neither a judgment against ATI resulting from a fully adversarial trial or a valid assignment of ATI's claims against Cincinnati. Second, it determined in the alternative that the insurance policy did not provide any coverage for the *Bartlett* lawsuit. It concluded that the *Nelson* lawsuit and the *Bartlett* lawsuit were "sufficiently related to constitute a single claim under the policy's provisions," which was first made against ATI prior to the policy period. The court did not address whether any of the exclusions barred coverage nor whether the settlement-and-release agreement precluded any recovery from Cincinnati.[4]

Four days later, on March 16, 2020, the district court entered final judgment in Cincinnati's favor and purportedly closed the case. After the district court did so, the Plaintiffs took two courses of action: one in state court and another in federal court.

On April 6, 2020, in McLennan County state court, the Plaintiffs filed a motion for a declaration of entitlement of ATI's claims for insurance-policy proceeds against Cincinnati.[5] In that motion, the Plaintiffs also requested the

_____

[4] We will not address the Cincinnati's policy-exclusions and settlement-and-release arguments either. Both are unnecessary in light of our analysis.

[5] As the federal district court acknowledged, when the Plaintiffs filed this collateral state-court motion, they "did not notify anyone associated with ATI or [Cincinnati] of the Transfer Motion" and did not "disclose to the state court this coverage litigation or this Court's summary judgment decision."

appointment of a receiver, Charles Levy, for ATI and asked the court to order Levy to prosecute ATI's claims and then to convey recovered proceeds to the Plaintiffs. On April 21, 2020, the state court granted the Plaintiffs' motion, appointed Levy as receiver, and purportedly conveyed the Plaintiffs' and ATI's claims and causes of action against Cincinnati to Levy. On April 23, 2020, Levy moved to intervene permissively in this federal-court case.

Also in federal court, the Plaintiffs filed a Rule 59(e) motion to alter judgment, which challenged the district court's legal conclusions about standing in its summary-judgment ruling. The district court issued an order denying the Plaintiffs' Rule 59(e) motion. It also entered an order denying Levy's motion to intervene.

The Plaintiffs filed a notice of appeal to challenge the orders granting summary judgment, entering final judgment, and denying their motion to alter judgment. Levy filed a notice of appeal to challenge the order denying his motion to intervene.

## DISCUSSION

We review the district court's grant of summary judgment *de novo*. *Gonzalez v. Mid-Continent Cas. Co.*, 969 F.3d 554, 556 (5th Cir. 2020). In this diversity case, we must apply the substantive law of Texas. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). "This court also reviews *de novo* a district court's interpretation of state law and is bound to resolve the issue as the state's highest court would." *Ironshore Eur. DAC v. Schiff Hardin, L.L.P.*, 912 F.3d 759, 764 (5th Cir. 2019). We look first to the opinions of the Texas Supreme Court. *Id.* If the state high court has not resolved an issue, we will make a reasoned effort to determine what that court would decide under these facts. *Id.* "In doing so, we typically treat state intermediate courts' decisions as the strongest indicator of what [the] state supreme court would

do, absent a compelling reason to believe that the state supreme court would reject the lower courts' reasoning." *Id.* (quotation marks and footnote omitted).

As for Levy's appeal, "[w]e have 'provisional jurisdiction' to review a district court's order denying permissive intervention." *Rotstain v. Mendez*, 986 F.3d 931, 942 (5th Cir. 2021). "If the district court did not abuse its discretion by denying permissive intervention, we 'must dismiss the appeal for lack of jurisdiction.'" *Id.* (citation omitted).

We separately analyze each issue.

## I. *Was Cincinnati entitled to summary judgment?*

The district court granted summary judgment to Cincinnati for two reasons. First, it determined that the Plaintiffs lacked standing to bring a direct action against Cincinnati without either an adversarial judgment or a valid assignment. Second, it determined that the *Bartlett* lawsuit fell outside the scope of ATI's insurance coverage. Because, as we will explain, Texas courts consider the no-direct-action rule to be jurisdictional, we must begin there and reach the scope of the insurance coverage only if we are satisfied that the Plaintiffs have standing to sue. We now begin.

### A. *Can the Plaintiffs maintain a direct action against Cincinnati?*

The Plaintiffs obtained a default judgment against ATI. The parties dispute whether that non-adversarial judgment is enough to sue Cincinnati, their wrongdoer's insurer.

The answer to this question lies at the intersection of two lines of Texas Supreme Court cases. In one, the court has enforced a rule that "an injured party cannot sue the [defendant's] insurer directly until the [defendant's] liability has been finally determined by agreement or judgment." *See, e.g.*, *In re Essex Ins. Co.*, 450 S.W.3d 524, 525 (Tex. 2014).

This is an application of the "no direct action" rule. *Id.* In another line, the Texas Supreme Court has explained when "a judgment or settlement between the insured and [that] plaintiff" is "binding" on the insurer in a subsequent coverage suit. *See, e.g.*, *Great Am. Ins. Co. v. Hamel*, 525 S.W.3d 655, 662, 668 (Tex. 2017). To bind an insurer, a judgment against a defendant it insured must result from a "fully adversarial" proceeding. *See id.* at 666–68.

In order to decide whether the Plaintiffs' non-adversarial default judgment against ATI permits them to sue Cincinnati, we must determine whether (and if so, to what extent) the Texas Supreme Court's holdings in *Hamel* and related opinions affect whether a default judgment for a plaintiff against an insured–defendant satisfies the no-direct-action rule. We begin by providing a background of both lines of Texas authority, then analyze whether and how they work together.

### 1.    *The no-direct-action rule*

"[A]n 'insurance policy is a contract' that establishes the respective rights and obligations to which an insurer and its insured have mutually agreed." *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 488 (Tex. 2018) (citation omitted). The contracting parties, *i.e.*, ATI and Cincinnati, generally can maintain suit on the insurance policy. *See, e.g.*, *State Farm Lloyds v. Richards*, 966 F.3d 389, 391 (5th Cir. 2020) (insurer sued insured); *Menchaca*, 545 S.W.3d at 485 (insured sued insurer).

A party aggrieved in contract or tort "by the insured is a third party beneficiary of a liability insurance policy." *State Farm Cnty. Mut. Ins. Co. v. Ollis*, 768 S.W.2d 722, 723 (Tex. 1989). In Texas, though, these third-party beneficiaries face the hurdle of the no-direct-action rule. "[T]he general rule is that an injured party cannot sue the [defendant's] insurer directly until the [defendant's] liability has been finally determined by agreement or

judgment." *In re Essex*, 450 S.W.3d at 525 (ellipses omitted). In other words, a third-party beneficiary as plaintiff "cannot enforce the policy directly against the insurer until it has been established, by judgment or agreement, that the insured has a legal obligation to pay damages to the injured party." *Ollis*, 768 S.W.2d at 723.

Important to our need to address this issue, several Texas courts of appeals have held that the no-direct-action rule is jurisdictional because there is no justiciable controversy between the third-party plaintiff and the insurer without a judgment or agreement establishing the insured–defendant's liability. *See Landmark Am. Ins. Co. v. Eagle Supply & Mfg. L.P.*, 530 S.W.3d 761, 772 (Tex. App.—Eastland 2017, no pet.) (analyzing the rule as an issue of ripeness); *Auzenne v. Great Lakes Reinsurance, PLC*, 497 S.W.3d 35, 37–38 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (ripeness); *Ohio Cas. Ins. Co. v. Time Warner Ent. Co., L.P.*, 244 S.W.3d 885, 888–89 (Tex. App.—Dallas 2008, pet. denied) (standing).

The no-direct-action rule arises in part from the frequent usage of no-action clauses in insurance policies and the Texas courts' willingness to enforce such provisions: "We have held that when such 'no action' policy provisions exist, 'a third party's right of action against the insurer does not arise until he has secured such an agreement or a judgment against the insured.'" *Getty Oil Co. v. Ins. Co. of N. Am.*, 845 S.W.2d 794, 801 (Tex. 1992) (quoting *Great Am. Ins. Co. v. Murray*, 437 S.W.2d 264, 265–66 (Tex. 1969)). The insurance policy in this case contains a no-action clause. Even beyond the inclusion of such language in contracts of insurance, there also is a public-policy reason against allowing a third-party plaintiff to sue an insured–defendant's insurer before liability has been established, as the lawsuit would create a conflict of interest for the insurer. *See Ohio Cas. Ins. Co.*, 244 S.W.3d at 888–89.

The Plaintiffs in this case obtained a default judgment against ATI. Our question is whether the default judgment satisfies the no-direct-action rule such that the Plaintiffs can sue Cincinnati under ATI's insurance policy to collect on the default judgment. That question implicates the group of Texas Supreme Court cases that discuss when a judgment against an insured–defendant binds the insurer.

### 2.    Hamel *and related cases*

In a series of decisions, the Texas Supreme Court established the circumstances under which a judgment against an insured–defendant, or a settlement between the third-party plaintiff and the insured–defendant, is "binding" on the insurer in a subsequent coverage suit. We draw from those decisions a general principle that "an insurer that wrongfully refuses to defend its insured is barred from collaterally attacking a judgment or settlement between the insured and the plaintiff." *Hamel*, 525 S.W.3d at 662–63 (discussing *Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660, 671 (Tex. 2008), and *Employers Cas. Co. v. Block*, 744 S.W.2d 940, 943 (Tex. 1988)). The reach of that general principle was limited by *State Farm Fire & Casualty Co. v. Gandy*, 925 S.W.2d 696, 714 (Tex. 1996). *See Hamel*, 525 S.W.3d at 663.

In *Gandy*, as part of a settlement, an insured–defendant assigned his insurance-coverage claims to a third-party plaintiff without giving notice to his insurer. 925 S.W.2d at 698. The trial court entered an agreed judgment for the plaintiff against the insured–defendant, and then the plaintiff sued the insurer as a judgment creditor and assignee. *Id.* The Texas Supreme Court invalidated the assignment as contrary to public policy because it prolonged and distorted the litigation. *Id.* at 711–12. "Without the assignment and covenant not to execute, the agreed judgment would never have been rendered." *Id.* at 713. As a result, the court rendered a take-nothing judgment

in the suit against the insurer. *Id.* at 720. After announcing a narrow set of circumstances under which an assignment will be invalidated,[6] the *Gandy* court stated: "In no event, however, is a judgment for plaintiff against defendant, rendered without a fully adversarial trial, binding on defendant's insurer or admissible as evidence of damages in an action against defendant's insurer by plaintiff as defendant's assignee." *Id.* at 714.

Later, in the *Hamel* case, third-party plaintiffs had obtained a non-adversarial judgment and an assignment from an insured–defendant, then sued the insurer. 525 S.W.3d at 661. Prior to obtaining the judgment and assignment, the plaintiff and insured–defendant reached a pretrial agreement that "removed the [insured–defendant's] stake in the outcome and any corresponding incentive to defend itself." *Id.* at 668. Because the judgment and assignment were not the product of a "fully adversarial" proceeding, the court held that the judgment was "not binding against [the insurer] in the present suit brought by the [third-party plaintiffs] as judgment creditors and assignees," *id.*, despite the insurer's wrongful refusal to defend the insured–defendant, *id.* at 666.

In its analysis, the *Hamel* court clarified what it meant in *Gandy* when it said that "a judgment for plaintiff against defendant, rendered without a fully adversarial trial, [is not] binding on defendant's insurer." *Hamel*, 525 S.W.3d at 663, 666 (quoting *Gandy*, 925 S.W.2d at 714). As the *Hamel* court

---

[6] The court explained:

> [A] defendant's assignment of his claims against his insurer to a plaintiff is invalid if (1) it is made prior to an adjudication of plaintiff's claim against defendant in a fully adversarial trial, (2) defendant's insurer has tendered a defense, and (3) either (a) defendant's insurer has accepted coverage, or (b) defendant's insurer has made a good faith effort to adjudicate coverage issues prior to the adjudication of plaintiffs claim.

> *Gandy*, 925 S.W.2d at 714.

explained, a judgment does not *bind* an insurer unless "at the time of the underlying trial or settlement, the insured bore an actual risk of liability for the damages awarded or agreed upon, or had some other meaningful incentive to ensure that the judgment or settlement accurately reflects the plaintiff's damages and thus the defendant–insured's covered liability loss." *Id.* at 666.

In *Hamel*, the non-adversarial judgment did not bind the insurer, but the court allowed the case to proceed: "Accordingly, while we will not hold an insurer to a judgment that was not the result of an adversarial proceeding, we will not preclude the parties from properly litigating the underlying liability issues in a subsequent coverage suit." *Id.* at 669.

From this background, we must determine whether the Plaintiffs' non-adversarial default judgment satisfies the no-direct-action rule.

### 3. Does the Plaintiffs' non-adversarial default judgment satisfy the no-direct-action rule?

From the Texas Supreme Court's no-direct-action rule decisions, we know that "the general rule is that an injured party cannot sue the [insured–defendant's] insurer directly until the [insured–defendant's] liability has been finally determined by agreement or judgment." *See In re Essex*, 450 S.W.3d at 525 (ellipses omitted). Texas's highest court, though, has not decided a case involving the no-direct-action rule in the context of plaintiffs obtaining a judgment that is potentially insufficient. At the same time, the court decided each of the cases in the *Hamel* line — including *Hamel*, *Gandy*, *ATOFINA*, and *Block* — without any reference to the no-direct-action rule. We must determine whether there is any overlap.

After *Hamel*, one Texas court of appeals applied the no-direct-action rule and *Hamel* together, holding that two non-adversarial judgments did not satisfy the no-direct-action rule. *See Landmark*, 530 S.W.3d at 770–72. In

that case, a third-party plaintiff sought to enforce two non-adversarial judgments against the insured–defendant's insurer. *Id.* at 770. There was a policy provision barring direct actions under certain circumstances, as follows:

> No action will be taken against [Landmark] unless, as a condition precedent, the Insured is in full compliance with all of the terms of this policy and until the amount of the insured's obligations to pay shall have been finally determined, either by judgment against the insured *after actual trial*, or by written agreement of the insured, the claimant and the Company.

*Id.* (first alteration in original) (emphasis added). Applying the no-direct-action rule and *Hamel* together, the court held that, "without a sufficient judgment against [the insured–defendant], [the third-party plaintiff] does not have a ripe claim under the no-direct-action rule to pursue a breach of contract claim as a judgment creditor against [the insurer]." *Id.* at 772. In other words, the judgments against the insured–defendant did not satisfy the no-direct-action rule because neither was "the result of a fully adversarial trial under *Hamel* and *Gandy*." *Id.*

The *Landmark* decision is distinguishable from this case because the language of the no-action clause in that case is materially different from the no-action clause in this case. Cincinnati's policy provision did not include language requiring an actual trial, but it did require an "adjudication":

> No action shall be taken against us unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy and until the obligation of the "policy insureds" to pay shall have been finally determined, either by an adjudication against them or by written agreement of the "policy insureds," the claimant and us. Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the

insurance afforded by this policy. Bankruptcy or insolvency of a "policy insured" or of a "policy insured's" estate shall not relieve us of any of our obligations hereunder.

An important insurance-law treatise analyzed caselaw involving policies that prohibit direct actions until an actual trial has been held and concluded that such language should be applied literally:

> There is authority that where a liability policy provides that no action may be brought against the insurer until the amount of the insured's obligation is determined by judgment against the insured *after actual trial*, it is necessary that there have been an actual trial, for such a provision imposes the requirement of an actual contest of issues and does not include a judgment entered by the court after the approval of a compromise settlement agreement by the insured and the injured party *nor a default judgment*.

7A Couch on Insurance § 105:20 (emphasis added) (footnotes omitted). In one of the opinions cited by the treatise, a Texas court of appeals had held that an "actual trial" in the context of a no-action clause means "a contest of issues leading up to final determination by court or jury, in contrast to a resolving of the same issues by agreement of the parties; *i.e.*, without a contest." *Wright v. Allstate Ins. Co.*, 285 S.W.2d 376, 379–80 (Tex. App.—Dallas 1955, writ ref'd n.r.e.). The *Wright* court concluded that the non-adversarial consent judgment in that case did not satisfy the no-direct-action rule. *Id.* at 380.

The *Wright* court's description of an "actual trial" parallels the *Hamel* court's description of "fully adversarial" proceedings, where it held that "proceedings are 'adversarial' when the parties oppose each other." *Hamel*, 525 S.W.3d at 666. The similarities of these two descriptions support the conclusion that an adversarial judgment will satisfy a no-action clause containing an actual-trial requirement, while a non-adversarial judgment will

No. 20-50548

not. By contrast, if the policy *lacks* such an actual-trial requirement or similarly demanding language, we see no basis to require adversity in the proceedings.

From these authorities, we determine that the Texas Supreme Court would hold as follows. First, the "general rule" applies, *i.e.*, a third-party plaintiff is barred from suing the defendant's insurer, when the third-party plaintiff has obtained neither a judgment nor agreement of any kind establishing the insured–defendant's liability.

Second, if the third-party plaintiffs obtain a judgment, then the court must look to the language of the no-action clause to determine whether it is the sort of judgment that satisfies the no-direct-action rule. For example, if the no-action clause contains an "actual trial" requirement, then the judgment must be sufficiently adversarial under *Hamel* and *Wright*. Generally speaking, the court must determine whether the obtained judgment satisfies whatever requirement the relevant no-action clause contains. After all, "an 'insurance policy is a contract' that establishes the respective rights and obligations to which an insurer and its insured have mutually agreed," *Menchaca*, 545 S.W.3d at 488, and the plaintiffs are third-party beneficiaries seeking to sue under that policy, *Ollis*, 768 S.W.2d at 723.

With this legal analysis in mind, we examine the facts of this case. The Plaintiffs obtained a default judgment against ATI. The relevant question, then, is whether the judgment suffices under the no-action clause. The clause in Cincinnati's policy does not require an actual trial, but the plaintiff must have obtained "an adjudication against" ATI before bringing an action directly against Cincinnati.

The Texas Supreme Court, as we explained, has not issued a decision on this precise question. Texas courts of appeals, on the other hand, have dealt with related fact patterns. Most recently, in *Landmark*, one court of

18

appeals held that two non-adversarial judgments did not satisfy the no-direct-action rule when the no-action clause contained an actual-trial requirement. 530 S.W.3d at 770–72. A different court of appeals applied the rule in a manner seemingly inconsistent with *Landmark* when it held in two cases that non-adversarial default judgments were enough to get the third-party plaintiffs into court with the insurer, even though the no-action clauses contained actual-trial requirements. *See P.G. Bell Co. v. U.S. Fid. & Guar. Co.*, 853 S.W.2d 187, 189–90 (Tex. App.—Corpus Christi–Edinburg 1993, no writ); *Filley v. Ohio Cas. Ins. Co.*, 805 S.W.2d 844, 846–88 (Tex. App.—Corpus Christi–Edinburg 1991, writ denied).[7] Before that, a different court of appeals held that a plaintiff satisfied a no-action clause containing an actual-trial requirement through his non-adversarial appearance at trial after the insurer wrongfully refused to defend. *Gulf Ins. Co. v. Vela*, 361 S.W.2d 904, 908 (Tex. App.—Austin 1962, writ ref'd n.r.e.). Finally, as already explained, a court of appeals held that a non-adversarial agreed judgment was not a "judgment following actual trial" and therefore did not satisfy the no-action clause in that case. *Wright*, 285 S.W.2d at 379–80.

We do not find a seamless web of caselaw there, but most of the decisions are reconcilable with each other. In *Landmark* and *Wright*, non-adversarial judgments failed to satisfy no-action clauses that contained actual-trial requirements. The *Vela* decision is explainable by the pre-*Gandy* reluctance to allow insurers to attack a judgment collaterally after wrongfully

---

[7] The *Filley* court held that the third-party plaintiffs' suit failed because the insurer was not liable to the insured, and therefore not liable to the plaintiffs' either because the default judgment made the plaintiffs "third party judgment creditors . . . bound by the same rights, duties, and obligations of [the defendant–insured] under the terms and conditions of the insurance contract." 805 S.W.2d at 847.

refusing to defend. *See Block*, 744 S.W.2d at 942–43. *P.G. Bell Co.* and *Filley* may not completely fit with the other identified opinions.

In conclusion, the Plaintiffs' default judgment against ATI is an adjudication that satisfies the no-action clause. Accordingly, although the non-adversarial default judgment does not bind Cincinnati to its terms, *Hamel*, 525 S.W.3d at 668, the no-direct-action rule is not a bar to this coverage suit. We therefore disagree with the district court's determination that the Plaintiffs lacked standing to sue.

> B.     *Did the underlying lawsuit fall outside the scope of coverage?*

The district court determined, in the alternative, that Cincinnati was entitled to summary judgment because the *Bartlett* lawsuit was not within the insurance policy's scope of coverage.

Under Texas law, an insurer owes two "distinct and separate duties": the duty to defend the insured against lawsuits and the duty to indemnify the insured against claims and judgments. *D.R. Horton-Tex., Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740, 742 (Tex. 2009); *see also* 14 Couch on Insurance § 200:3. Whether a lawsuit activates an insurer's duty to defend is controlled by the "eight-corners rule." *Richards*, 966 F.3d at 392. "[U]nder Texas's well-established eight-corners rule, an insurer's 'duty to defend is determined by the claims alleged in the petition and the coverage provided in the policy.'" *Id.* (quoting *Pine Oak Builders, Inc. v. Great Am. Lloyds Ins. Co.*, 279 S.W.3d 650, 654 (Tex. 2009)). If the insured carries its initial burden of showing "that a claim is potentially within the scope of coverage," then the burden shifts to the insurer to show that a limitation or exclusion precludes "coverage of all claims, also within the confines of the eight corners rule." *Id.* at 393. Extrinsic evidence is generally irrelevant for the duty-to-defend question. *Id.* at 392–93.

The duty to indemnify, by contrast, "is determined by the facts that are eventually ascertained in the underlying lawsuit." *Hartford Cas. Ins. Co. v. DP Eng'g, L.L.C.*, 827 F.3d 423, 430 (5th Cir. 2016). This usually means "wait[ing] to resolve [the] duty to indemnify until after a trial in the underlying litigation because facts established at trial determine the duty to indemnify." *Id.* Unlike the duty to defend, it is usually improper to resolve "the duty to indemnify solely on the basis of the pleadings in the underlying lawsuit." *Id.* Because cases frequently do not go to trial, "the parties may offer extrinsic evidence to prove or negate the insurer's duty to indemnify if the underlying lawsuit never goes to trial or if trial does not develop the facts necessary to determine policy coverage." *Id.* In sum, the duty to indemnify "hinges on the facts established and the terms and conditions of the [insurance] policy." *D.R. Horton-Tex., Ltd.*, 300 S.W.3d at 744.

To recap, ATI's insurance policy covers any "claim" that is "first made" against ATI during the "policy period" (basically, all of 2011) for a "wrongful act." Under the policy, "all 'claims' based upon or arising out of the same 'wrongful act' or any 'interrelated wrongful acts' shall be considered a single 'claim'." Multiple acts constitute "interrelated wrongful acts" if they "have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events, or transactions." Finally, a claim is considered "first made" at the moment "notice of the earliest 'claim' arising out of such 'wrongful act' or 'interrelated wrongful acts' is received in writing by a 'policy insured' or by [Cincinnati], whichever comes first."

The district court determined that the *Bartlett* lawsuit, *i.e.*, the underlying lawsuit, fell outside of the scope of coverage because it was "sufficiently related" to the *Nelson* lawsuit, which was filed before the policy period. The court began its analysis by observing that the eight-corners rule applied to the duty-to-defend analysis, but not the duty-to-indemnify

analysis.  It then compared the *Bartlett* lawsuit petition (a pleading in the underlying lawsuit) to the *Nelson* lawsuit petition (an extrinsic pleading) and determined that the two lawsuits were "sufficiently related to constitute a single claim under the policy's provisions."  The *Nelson* lawsuit was filed on February 8, 2010, and the policy period began on December 30, 2010.  As far as we can determine, no party contested that notice of the *Nelson* suit was timely received.  As a result, the court concluded that the *Nelson* lawsuit and the *Bartlett* lawsuit were a single claim "first made" prior to the period of coverage.  For that reason, the court held that Cincinnati was entitled to summary judgment.

On appeal, the Plaintiffs raise two main issues about the district court's coverage analysis.  First, the Plaintiffs argue that the two lawsuits are not interrelated but, instead, are based on completely different acts.  Second, the Plaintiffs argue that Cincinnati breached its duty to defend under the confines of the eight-corners rule.  It appears that the Plaintiffs seek to establish a breach of the duty to defend so that Cincinnati can be ordered to defend ATI against the Plaintiffs' claims in a coverage trial, and then to indemnify ATI based on facts established at trial.

The complaint makes clear what relief the Plaintiffs seek: (1) "damages for the portions of their Judgments against ATI that are covered under the Cincinnati policy"; and (2) "insurance policy proceeds for the covered claim under the policy."  That is indemnity.  *See D.R. Horton-Tex., Ltd.*, 300 S.W.3d at 743.  As a result, the relevant question at this stage is whether Cincinnati has a duty to indemnify ATI for the Plaintiffs' claims.

The Plaintiffs make two related arguments concerning the district court's *method* of determining the duty to indemnify, *i.e.*, comparing the *Bartlett* lawsuit petition to the *Nelson* lawsuit petition.  They argue that the court erred by determining the duty to indemnify based "solely on the

allegations in the pleadings." Relatedly, they argue that the duty to indemnify should "be determined based on actual facts in connection with proceedings envisioned by *Hamel*," *i.e.*, a coverage trial.

Contrary to the Plaintiffs' suggestion, the district court did not rely "solely on the pleadings in the underlying lawsuit." *See Hartford*, 827 F.3d at 430. It compared the *Bartlett* lawsuit petition (a pleading in the underlying suit) to the *Nelson* lawsuit petition (an extrinsic pleading). The two petitions were not filed as pleadings in this case, but rather were submitted as extrinsic evidence to establish the relatedness of the two state-court lawsuits.

Contending that allegations in pleadings cannot constitute facts for a duty-to-indemnify inquiry, the Plaintiffs quote an opinion from the Texas Supreme Court that states, "Generally, pleadings are not competent evidence, even if sworn or verified." *Laidlaw Waste Sys. (Dall.), Inc. v. City of Wilmer*, 904 S.W.2d 656, 660 (Tex. 1995). In that case, the plaintiff attempted to rely on facts set forth in its petition to contest the defendant's motion for summary judgment in the same proceeding in which the petition was filed as a pleading. *Id.* A complaint is not evidence of the facts that are there alleged. Quite differently, we are not concerned with the accuracy of the *facts* in the complaints filed in the two different lawsuits. Instead, the similarity of the *allegations* is our inquiry. The pleadings that began the two state-court suits are *the* evidence of relatedness.

More generally, consideration of extrinsic complaints filed in other proceedings is not uncommon in the context of insurance litigation. For example, a Texas court of appeals compared two extrinsic pleadings in an appeal from summary judgment to determine whether a lawsuit filed after coverage expired was sufficiently related to other lawsuits filed during the period of coverage such that the later filed lawsuit fell within the scope of coverage. *See Burks v. XL Specialty Ins. Co.*, 534 S.W.3d 458, 461–65 (Tex.

App.—Houston [14th Dist.] 2015, no pet.). The two extrinsic petitions are proper summary-judgment evidence in this insurance-coverage dispute.

Further, there is no need for a coverage trial if the court can determine at the summary-judgment stage that Cincinnati had no duty to indemnify. The duty to indemnify "hinges on the facts established and the terms and conditions of the [insurance] policy." *D.R. Horton-Tex., Ltd.*, 300 S.W.3d at 744. The Texas Supreme Court explained in *D.R. Horton* that the duty to indemnify can be determined based on evidence submitted in the subsequent litigation when the underlying lawsuit did not result in a trial or sufficient factual development. *Id.* As we once explained, "the parties may offer extrinsic evidence to prove or negate the insurer's duty to indemnify if the underlying lawsuit never goes to trial or if trial does not develop the facts necessary to determine policy coverage." *Hartford*, 827 F.3d at 430. Accordingly, the relatedness of the two lawsuits, which is dispositive as to the duty to indemnify, can be decided via summary judgment. We now examine whether the court properly concluded that they were related.

Again, the Cincinnati policy provides that "all 'claims' based upon or arising out of the same 'wrongful act' or any 'interrelated wrongful acts' shall be considered a single 'claim'." Multiple acts constitute "interrelated wrongful acts" if they "have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events, or transactions."

The plaintiffs in both lawsuits were students of ATI trade schools, albeit at separate campuses. Both lawsuits alleged that "ATI intentionally create[d] and maintain[ed] a high pressure sales culture that constantly pushe[d] admissions representatives and managers to increase enrollment through aggressive and misleading sales techniques and tactics." Both lawsuits make several other allegations, drafted in passive voice in a manner

that hides the identity of the actor, as to how ATI's recruiters were "driven," "placed in constant fear," "encouraged," "trained," and "coached" to mislead prospective students about the quality and results of ATI's programs.    Both lawsuits alleged that ATI's schools suffered from overcrowding, inadequate resources, and a lack of qualified instructors.  The two petitions were, indeed, virtually identical to each other.

The Plaintiffs concede on appeal that the *Bartlett* lawsuit "claims were predicated on some of the same contextual misrepresentations allegations" as the *Nelson* lawsuit claims, and that the *Nelson* lawsuit petition "formed the template for the petition" in the *Bartlett* lawsuit.

Still, the Plaintiffs contend that the two lawsuits are not based on the same wrongful acts or interrelated wrongful acts.  Instead, they argue that the lawsuits involved different plaintiffs in different cities who attended different schools.  They also argue that there is no indication that any wrongful acts alleged in the two lawsuits were "the result of an overall corporate policy." Rather, they say that the two lawsuits involved "separate acts committed by separate schools."

In an effort to show a dispute of fact on relatedness, the Plaintiffs rely on an affidavit produced and submitted by their own counsel, Jay English, in opposition to Cincinnati's motion for summary judgment.  His affidavit stated, among other things, that each ATI campus coordinated its own marketing outreach.  English was the Plaintiffs' counsel in state court, in district court, and he continues to represent the Plaintiffs and Levy in this appeal.  Even if we assume that his affidavit is proper summary-judgment evidence — which is disputed by Cincinnati — it does not create a genuine dispute of material fact regarding relatedness.  For all of the affidavit's effort to disprove any connection between the Dallas and Waco campuses, the affidavit does not explain how the recruiters and admissions representatives

at different campuses were identically trained to market the ATI programs in misleading and deceptive ways — as the Plaintiffs alleged — without some common nexus of planning and coordination.

The Plaintiffs' arguments as to how the two lawsuits were different does not overcome the clear similarities between them both.  The virtually identical petitions alleged that "ATI intentionally create[ed] and maintain[ed] a high pressure sales culture that constantly pushe[d] admissions representatives and managers to increase enrollment through aggressive and misleading sales techniques and tactics."  The ATI entities' role in creating and maintaining this "high pressure sales culture," however small that role might have been, is a fact common to both lawsuits and integral to the claims presented in both.  As a result, we conclude that the *Bartlett* lawsuit and the *Nelson* lawsuit are based on at least one common "wrongful act" or "interrelated wrongful act" and therefore constitute a single claim under the insurance policy.

Accordingly, the two lawsuits are a single claim that was "first made" against ATI prior to the period of policy coverage.[8]  The claim fell outside the scope of the insurance policy, and Cincinnati had no duty to indemnify ATI.

## II.    *Levy's motion to intervene*

The district court denied Levy's motion to intervene permissively in this case.  He appealed that denial.  "If the district court did not abuse its discretion by denying permissive intervention, we 'must dismiss the appeal

---

[8] Again, because the Plaintiffs have not challenged the district court's implicit finding that ATI or Cincinnati received notice of the *Nelson* lawsuit "in writing" before the policy period began such that the claim was first made against ATI at that moment, we will not disturb that finding on appeal.

for lack of jurisdiction.'" *Rotstain*, 986 F.3d at 942 (quoting *Edwards v. City of Hous.*, 78 F.3d 983, 992 (5th Cir. 1996)).  Permissive intervention is "wholly discretionary" and may be denied even when the requirements of Rule 24(b) are satisfied. *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 471–72 (5th Cir. 1984).

The district court explained that it rejected Levy's motion to intervene because ATI's insurance policy did not cover the *Bartlett* lawsuit. Without coverage, there is no relief for Levy to seek.  Accordingly, we conclude that the district court did not abuse its discretion in denying Levy's motion to intervene.

Levy's appeal is DISMISSED for lack of jurisdiction.  We AFFIRM the district court's grant of summary judgment for Cincinnati.