**YOUNG MEN'S CHRISTIAN ASSOCIATION OF METROPOLITAN FORT WORTH et al., Appellants,**

**v.**

**COMMERCIAL STANDARD INSURANCE COMPANY, Appellee.**

**No. 17776.**

Court of Civil Appeals of Texas, Fort Worth.

March 25, 1977.

Rehearing Denied May 19, 1977.

Second Rehearing Denied June 23, 1977.

Brown, Crowley, Simon & Peebles, Fort Worth, Byrd, Davis, Eisenberg & Clark, Austin, Scarborough, Black, Tarpley & Scarborough and J. R. Black, Abilene, for appellants.

McBryde, Bogle & Green and John H. McBryde, Fort Worth, for appellee.

## OPINION

SPURLOCK, Justice.

Defendant insurance carrier's motion for summary judgment was granted in a case brought by the injured parties and the insured against the insurance carrier following a judgment obtained by the injured parties against the insured. The summary judgment was granted on the grounds that the injured parties and the insured had entered into a covenant in which the injured parties agreed not to levy execution on the assets of YMCA, the judgment debtor; and the insured, YMCA, had breached a non-waiver agreement with the insurer, thereby denying the insurer its right to defend the insured. The injured parties and insured appeal.

We reverse and remand.

The event giving rise to this litigation is an accident occurring on July 20, 1967, at a summer camp called Camp Carter, which was then operated by the Young Men's Christian Association of Fort Worth and Tarrant County. The name has since been changed to Young Men's Christian Association of Metropolitan Fort Worth, and will hereafter be referred to as YMCA. Johnny Howle, then nine years of age, was injured by another young camper. He was fishing from a crowded dock on a lake at Camp Carter when the other camper caused either a fish hook or a sinker to strike his eye. As a result, Johnny eventually lost his vision in that eye. YMCA learned of the accident the day it occurred, and notified George Mellina, the insurance agent who had issued a general liability insurance policy insuring YMCA with Commercial Standard Insurance Company. Mellina had also issued YMCA a hospitalization policy with another company.

The agent received the notice in writing, containing all the information required by both policies, the following day. The notice was apparently sent on the form provided for notifying the agent in order for the child to obtain medical treatment. About August 26, 1968, the injured boy's father inquired of YMCA whether it had liability insurance. YMCA that day notified the same agent, George Mellina, of this inquiry, again giving all the facts in writing. It was received by the agent August 27, 1968.

## NON–WAIVER AGREEMENT

The following day, August 28, 1968, YMCA and Commercial Standard entered into a standard "Non-Waiver Agreement," in which the insurer acknowledged it had issued its policy to the insured. The parties also agreed that any action taken by the insurer in investigating the above-described accident

". . . shall not in any way change, waive, invalidate or forfeit any of the terms, conditions and requirements of said policy or any of the rights of either of the parties hereto under said policy; and in the event any suit has been or shall be filed against the Insured, growing out of said accident, should the Company elect to defend said suit or participate therein, said defense or participation therein by it shall not be construed to change, waive, invalidate or forfeit any of the terms and conditions of said policy or any of its rights thereunder. No act of the Company, done by way of said investigation or defense, shall be construed as an admission of liability under said policy.

"It is the intention of this agreement to permit a full investigation of said accident and a defense of any suit brought on account of said accident, should the Company elect to defend, without in any way affecting, impairing or waiving any of the rights of either party hereto, except that the Insured waives the right to insist that such investigation or defense by the Company shall constitute an admission of liability under said policy." (Emphasis added.)

The summary judgment evidence shows without dispute that neither YMCA nor its personal attorney was ever informed by Commercial Standard that the carrier would be claiming a late-notice defense. The insured was not informed until April 14, 1972 (almost four years later) that the attorneys selected by Commercial Standard had a possible conflict of interest in representing both Commercial Standard and YMCA.

The Dallas firm of Strasburger, Price, Kelton, Martin & Unis was retained by Commercial Standard to defend the claim. It notified YMCA by letter dated June 26, 1969, that it was defending the case under a reservation of rights, without ever explaining to the YMCA what was meant by this term or that there was a question of late notice or conflict of interest. This letter further stated: "Of course, it is understood that none of your rights or contentions under your policy is waived." (Emphasis added.)

The insurance policy provided that the insurer would not "use as a defense the fact that the Y.M.C.A. of Ft. Worth is non-profit and Charitable Membership organization except in such instances as the Y.M.C.A. Board of Directors gives its permission to do so", and except when the verdict or judgment is in excess of the limits of liability stated in the policy (in this instance, $100,000.00).

Although the record does not disclose whether the Board of Directors of the YMCA ever gave its insurer permission to claim charitable immunity, YMCA filed a motion for summary judgment based solely upon this defense. We take judicial knowledge of the records of this court in *Howle v. Camp Amon Carter*, 462 S.W.2d 624 (Tex. Civ.App.—Fort Worth, 1971 rev'd). YMCA attached a certified copy of its charter to its motion, showing that it was a non-profit organization supported by paying members, fees collected, and donations. The summary judgment was granted, affirmed by this court, and then reversed by the supreme court. *Howle v. Camp Amon Carter*, 470 S.W.2d 629 (Tex.1971).

## THE ORIGINAL SUIT

In the personal injury suit, it was alleged that in 1967 Johnny Howle was struck in the eye by a sinker or hook attached to a fishing line cast by a fellow camper, Gary Post. Johnny lost the sight of one eye. Suit was brought by Johnny and his father against the other camper and YMCA. They alleged that the damages sustained were caused by, among other things, the negligence of employees of YMCA in failing to

supervise Gary properly and prevent his casting in the area where the accident occurred. The supreme court held that YMCA was not relieved from liability under the doctrine of charitable immunity and that a charitable enterprise is subject to vicarious liability under the rule of respondeat superior applicable to business organizations operated for profit. This case was remanded.

### (a) Notice of Late-Notice Defense

After remand, but before the case was retried, by letter of April 14, 1972, the Strasburger firm notified George Crowley, the personal attorney for YMCA, that the plaintiffs had amended their petition and were now suing for at least $220,000.00, an amount in excess of the limits of the YMCA's policy. In that letter the insurance company's attorney for the first time notified the personal attorney for YMCA that they were defending the suit under the non-waiver agreement because of the insurer's belief that it had not been furnished notice of the incident in question as promptly as required by the terms of the policy.

The letter confirmed a telephone conversation between these attorneys two days earlier, in which Crowley had indicated that under these circumstances he desired to become an attorney of record for YMCA.

The injured parties and YMCA then agreed to enter into a "Covenant Not to Execute." By this covenant YMCA intended to protect itself from the possibility of a judgment in excess of the policy limits and from having execution levied upon its property in the event Commercial Standard prevailed in its late-notice defense that there was no coverage. The injured parties agreed to the covenant because they thought the insurance carrier would defend and thus, if it had not already done so, would waive the late-notice policy defense; the case would probably be settled; and they had no desire to levy execution upon the property of the YMCA.

Crowley then notified the Strasburger firm by letter of June 6, 1972, that its representation of YMCA on retainer by the insurance carrier was no longer acceptable to YMCA *under the non-waiver agreement*. Demand was made that the insurance carrier accept full coverage and responsibility. The letter also advised that YMCA would construe any further representation of it by that firm as a waiver of any rights to deny coverage which may then have been owned by the insurance carrier. The letter from Crowley to the Strasburger firm emphasized that YMCA would continue to cooperate with the insurance company, and its attorneys in the defense of the case and do everything in their power to assist them in defeating the claims asserted by the injured parties. The Strasburger firm then withdrew as counsel of record for YMCA, and Commercial Standard refused to defend.

### (b) Temporary Guardianship Authorizing Covenant not to Execute

An application was made for the appointment of a temporary guardian of the minor plaintiff, describing what had transpired and the reservation of rights problem. The proposed guardian's authority was to be for the purpose of executing the covenant not to execute which was attached to the application. The Honorable Robert Burnett, Probate Judge, granted the application, appointed Laurance Priddy, an attorney, as temporary guardian, authorizing him to execute the covenant not to execute.

### (c) Covenant not to Execute

The covenant was executed in June 1972 by Johnny's father, the temporary guardian, and the YMCA. In summary form, it provides that the Howles ". . . agree and covenant that they shall not . . . levy or issue execution, garnishment or any other process, including abstract of judgment against any assets, or property, of any kind or description, of covenantee [YMCA] herein, with the sole exception of the liability insurance policy which covenantee Young Men's Christian Association of Metropolitan Fort Forth as insured thereunder may have with Commercial Standard Insurance Company . . . ." It then describes the policy.

It further provides that the Howles will indemnify YMCA to the extent of any amount of judgment which might be rendered in favor of the Howles against YMCA in excess of what is actually collected from the insurance carrier. It also provides that the covenant will not be considered as an admission of liability. It was executed without prejudice to deny liability in any form. YMCA further covenanted that it would cooperate with its insurance carrier in the defense of the suit and that "from this date forward it will fulfill each and every contractual provision contained in said insurance policy and be guilty of no act or omission giving a right to said insurance company or receiver to deny liability or coverage by reason of said insurance policy by its actions."

The Howles reserved the right to proceed against the insurance carrier for recovery of full satisfaction of their claim against it to the extent of the insurance carrier's liability for the incident and for failure to properly defend YMCA.

The cause proceeded to trial without a jury; YMCA was represented by its personal counsel. Judgment was rendered on January 30, 1973, in favor of the Howles by the Honorable James Wright, Judge of the 141st District Court. The judgment recites that the evidence was fully developed and it orders that Johnnie [sic] Howle, recover judgment in the sum of $28,000 and John W. Howle, his father, recover judgment in the sum of $17,000.

## THE SUIT ON THE POLICY AGAINST THE INSURER

By the time the suit now on appeal, *i. e.*, the suit to require Commercial Standard to pay the above judgment, had been filed, John W. Howle had died and Johnny Howle had reached his majority. Johnny filed in his own behalf, and was joined by the executrix of his father's estate, and by YMCA, as plaintiffs against Commercial Standard.

The insurance carrier filed an amended motion for summary judgment, limiting itself to the following three grounds:

(1) The conduct of the YMCA deprived Commercial Standard of its contractual right of defense.

(2) YMCA had no legal obligation to make payments to Johnny Howle or his father's estate, with the consequence that Commercial Standard had no liability due to the fact that its insuring obligation was to ". . . pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages . . . ."

(3) Because of this covenant, YMCA has no obligation to make payment to Johnny Howle or his father's estate, with the consequence that this suit against Commercial Standard is unauthorized, by virtue of the policy condition that no action shall lie against the company until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.

This court may not consider any other grounds for sustaining the summary judgment. *City of Pasadena v. State ex rel. City of Houston*, 442 S.W.2d 325 (Tex.1969).

It is well settled that the burden of proof is on the movant in a summary judgment proceeding. A summary judgment should not be granted unless there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. All conflicts in the evidence are disregarded, and the evidence which stands to support the position of the party opposing the motion is accepted as true. *Farley v. Prudential Insurance Company*, 480 S.W.2d 176 (Tex.1972).

### Pertinent Policy Provisions

The policy here involved is a "General-Automobile Liability Policy," containing "comprehensive general liability insurance" coverage. The pertinent provisions follow:

*Legal Obligation to Pay*: "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of  .  .

bodily injury . . . to which this insurance applies . . . ."

*Supplemental Payments*: The insurer agrees to pay the insured for the cost of a bail bond, cost of first aid to others, and other expenses, *incurred* by the insured.

*Right and Duty to Defend*: ". . . (T)he company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and máy make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements."

*No Action*: ". . . No action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company."

*Third Party Beneficiary*: "Any person or organization or the legal representative thereof *who has secured such judgment* or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. . . ." (Emphasis added.)

*Notice*: The insured must give written notice of the occurrence as soon as practicable containing certain specific information.

## OPINION

YMCA contends it complied with the notice condition by immediately sending notice, in writing, to the agent who issued the policy. The notice included all known information concerning the occurrence. YMCA also contends that because it was an accident between two campers, they had no idea they were in any way involved until about a year later, when the child's father inquired whether YMCA had liability insurance. Further, the agent had instructed YMCA not to report accidents of this type. Upon the father's inquiry, YMCA immediately again notified the same agent. They assert that under these facts, Commercial Standard was properly notified, and had the duty to defend the suit.

▉ If the notice provision was complied with, then YMCA had the right to demand and receive an unconditional defense, unburdened by a reservation of rights or non-waiver agreement. *American Fidelity & Casualty Co. v. Williams*, 34 S.W.2d 396 (Tex.Civ.App.—Amarillo, 1930 writ ref'd); *Pacific Indemnity Co. v. Acel Delivery Service, Inc.*, 485 F.2d 1169, 1173 (5th Cir. 1973); 7A J. Appleman, Insurance Law and Practice § 4694, n. 20.10, at 544 (1962).

▉ YMCA is not contending that the non-waiver agreement was not binding before YMCA, though Crowley, its personal attorney, notified Commercial Standard on June 6, 1972, that it was no longer acceptable to YMCA that Commercial Standard defend under the reservation of rights agreement, as noted above. We hold the duty to defend, from that date forward, was not waived.

▉ At the time the letter was written, counsel retained by Commercial Standard had been representing YMCA as its attorney of record for several years: through the trial court, the court of civil appeals and the supreme court, and again in the trial court after remand. According to Commercial Standard's brief, the firm had taken more than 14 depositions prior to the time the letter was written.

It is our opinion that YMCA had not breached the non-waiver agreement for the additional reasons set forth in *Employers Casualty Company v. Tilley*, 496 S.W.2d 552, 559 (Tex.1973). In that case, involving the construction of the "no-action" clause, a situation similar to this case was before the supreme court. That insured had also signed a standard non-waiver agreement. In that case as in the case before us, the

insurance carrier had taken a non-waiver agreement and had thereafter purported to offer a defense to the insured without notifying it either of any conflict of interest or of the nature of the coverage question. This representation by the insurance carrier's lawyer continued for the subsequent 18 months. That court held that, as a matter of law, the insurer was estopped from denying its responsibility to defend under its policy.

That court stated as follows:

"The American Bar Association National Conference of Lawyers and Liability Insurers made a careful study of this recurring problem and issued a list of 'Guiding Principles' for the guidance of liability insurers furnishing legal counsel for their insureds.[2] Two of the principles which are relevant here read in part as follows:

"[2] 'National Conference of Lawyers and Insurers—Guiding Principles' 20 Federation of Insurance Counsel Journal 95 et seq. (1970).

" 'IV. CONFLICTS OF INTEREST GENERALLY—DUTIES OF ATTORNEY. In any claim or in any suit where the attorney selected by the company to defend the claim or action becomes aware of facts or information which indicate to him a question of coverage in the matter being defended or any other conflict of interest between the company and the insured with respect to the defense of the matter, the attorney should promptly inform both the company and the insured, preferably in writing, of the nature and extent of the conflicting interest. . .

" 'V. CONTINUATION BY ATTORNEY EVEN THOUGH THERE IS A CONFLICT OF INTERESTS. Where there is a question of coverage or other conflict of interest, the company and the attorney selected by the company to defend the claim or suit should not thereafter continue to defend the insured in the matter in question unless, after a full explanation of the coverage question, the insured acquiesces in the continuation of such defense . . . .'

"We approve the above quoted 'guiding principles' as conforming to the public policy of this State heretofore enunciated by this Court in our Canons of Ethics. They follow the same general principles earlier recognized by Texas courts. See *Automobile Underwriters' Insurance Co. v. Long, supra* [63 S.W.2d 356 (Tex.Com. App.)] *Travelers Ins. Co. v. Chicago Bridge & Iron Co.*, 442 S.W.2d 888 (Tex. Civ.App.1969, writ ref. n. r. e.); and *Barreda Corp. v. Ballenger*, 116 S.W.2d 442 (Tex.Civ.App.1938, writ dism'd).

"Conduct in violation of the above principles by the insurer through the attorney selected by it to represent the insured has been condemned by the highest courts of several other jurisdictions. In *Perkoski v. Wilson*, 371 Pa. 553, 92 A.2d 189 (1952); *Tiedtke v. Fidelity & Casualty Company of New York*, 222 So.2d 206 (Fla.1969); *Bogle v. Conway*, 199 Kan. 707, 433 P.2d 407 (1967); *Crum v. Anchor Casualty Company*, 264 Minn. 378, 119 N.W.2d 703 (1963); *Merchants Indemnity Corp. v. Eggleston*, 37 N.J. 114, 179 A.2d 505 (1962); and *Van Dyke v. White*, 55 Wash.2d 601, 349 P.2d 430 (1960), analogous conduct in violation of such principles was held to preclude or estop the insurer from denying coverage or liability. See also general criticisms and consequences of such conduct discussed in *Meirthew v. Last*, 376 Mich. 33, 135 N.W.2d 353 (1965); and *Newcomb v. Meiss*, 263 Minn. 315, 116 N.W.2d 593 (1962)."

The court then held that the above guiding principles are not diluted or nullified by a general non-waiver agreement; that the attorney selected by the insurance company to defend the insured must inform the insured of the specific conflict and afford him the opportunity to retain his own counsel; that to interpret the effect of the non-waiver agreement so as to permit such subsequent action and relieve the insurance carrier of the consequences thereof, would completely nullify those principles which arise from the attorney-client relationship; and that under the facts in that case, it would be untenable to permit the insurance carrier to disclaim liability for the defense

of the insured in the suit filed against him as a result of the late-notice defense. See also Germer & Tebbs, *Conduct of Defense Attorney and Insurance Company in Defending an Insured where a Coverage Question is Involved*, 13 S.Tex.L.J. 223 (1972) (written the year before the *Tilley* case was decided.)

It is our opinion and we hold that under the facts in this case Commercial Standard was estopped from denying coverage or liability and therefore owed YMCA a defense unencumbered by any reservation of rights.

■ Implicit within Commercial Standard's argument is an assumption that the policy is one of indemnity rather than liability. An analysis of the distinction follows:

The insurer in a liability policy agrees to defend the insured and to protect it from liability. If it is unsuccessful and must settle, or a judgment is rendered against the insured, the insured is not required to pay the obligation before the insurer is required to pay. In the event a judgment is rendered against the insured, the insurer's liability to pay attaches at that time. The obligation to pay continues until the judgment is satisfied.

An indemnity policy, on the other hand, provides that no action shall lie against the insurer unless judgment against the insured *has actually been paid*. See *Allstate Insurance Company v. Warren*, 125 So.2d 886 (3rd Dist.Ct.App.—Florida, 1961); *Seguros Tepeyac, S.A., Compania Mexicana v. Bostrom*, 347 F.2d 168 (5th Cir. 1965); 32 Tex. Jur.2d Insurance § 4, at 28 (1962).

It is our opinion and we hold that the policy in the case at bar is one of liability, as distinguished from an indemnity contract.

We next consider the effect of the "covenant not to execute" on the liability of Commercial Standard under the terms of the "legal obligation to pay" and "no-action" clauses in the insuring agreement.

In *First National Indemnity Company v. Mercado*, 511 S.W.2d 354 (Tex.Civ.App.—Austin, 1974 no writ), an insurance carrier refused to defend the insured. In order to protect itself, the insured secured a covenant in which the claimants agreed not to execute except upon the policy. The court held that if the insured, under those circumstances, is left to defend himself, it is reasonable that he covenant against his own liability and hold the costs of his defense to a minimum. That court further pointed out the well-established rule that although an insurance company ordinarily may insist upon compliance with the condition found in the "no-action" clause, the company may not do so after it is given the opportunity to defend the suit or to agree to the settlement, and refuses to do either on the erroneous ground that it has no responsibility under the policy. The court relied upon *Gulf Insurance Company v. Parker Products, Inc.*, 498 S.W.2d 676, 679 (Tex.1973); *Womack v. Allstate Insurance Company*, 156 Tex. 467, 296 S.W.2d 233, 237 (1956).

It is our opinion and we hold that the same reasoning and results would apply, had the case been decided under the "legal obligation to pay" provision of the insurance policy.

In *Langdeau v. Pittman*, 337 S.W.2d 343 (Tex.Civ.App.—Austin, 1960 writ ref'd n. r. e.), the court had before it an action against the receiver appointed for Highway Insurance Underwriters, for personal injuries sustained by a claimant as a result of a collision between a truck it had insured, and an automobile. In that case the claimants agreed they would satisfy their claim against the insurer only. They also agreed to indemnify and hold harmless the defendants to the extent of the amount of any judgment which might be rendered in favor of the plaintiffs against defendants in excess of what is actually collected from the insurance carrier. That court held the covenant not to execute did not release the insurance carrier of liability under the policy. The language of that covenant not to execute is very similar to the one here before us.

The general principle of law is stated in 7 Tex.Jur.2d Rev. Part 1, *Automobile Insurance*, § 43, at 308, "Judgment against insured as prerequisite." (1975), ". . .

after the injured party has secured a favorable judgment against the insured in a court of competent jurisdiction, the liability of the insurer to pay the judgment to the extent of its bond or policy attaches. Such judgment is the basis of the injured third party's suit and permits the judgment creditor of the insured to institute an action in the nature of a third-party beneficiary action against the insurer to the extent of its policy limits."

If this had been an indemnity policy rather than a liability policy there would have been no legal obligation to pay until the YMCA had paid the judgment. But this policy specifically gives the claimants, who are judgment creditors, the right of direct action against the insured's liability carrier before judgment is satisfied.

As applied to the facts in this case, we agree with the language of the Arizona Supreme Court in *Rager v. Superior Coach Sales & Service of Arizona*, 110 Ariz. 188, 516 P.2d 324, 327 (1973), which states:

"A covenant not to execute is certainly not a satisfaction, nor is it the same as a release. Its legal effect is similar to a covenant not to sue, in that it does not extinguish the plaintiff's cause of action and does not operate to release other joint tortfeasors. *Pellett v. Sonotone Corp.*, 26 Cal.2d 705, 160 P.2d 783, 160 A.L.R. 863 (1945); *Whittlesea v. Farmer*, 86 Nev. 347, 469 P.2d 57 (1970)."

Appellants' points of error are sustained.

Judgment is reversed and remanded.

## ON MOTION FOR REHEARING

■ The probate court authorized the temporary guardian, Laurance L. Priddy, to execute the covenant not to execute. This covenant was signed by John W. Howle, the boy's father; YMCA; and Laurance L. Priddy, as Temporary Guardian of the Estate of Johnny Howle, a minor. They covenanted ". . . that they shall not, nor shall anyone for them or on their behalf, levy or issue execution, garnishment or any other process, . . . .." Nowhere does Johnny Howle so covenant, nor does anyone

covenant that Johnny Howle will not levy or issue execution, garnishment or any other process. The covenant attempted to bind only the temporary guardian. The petition on which this case was tried was filed November 20, 1975, two weeks after the child had reached his majority. Even if he were bound during his minority, which is not necessary for us to decide, he certainly is not bound now that he is an adult.

On March 15, 1974, in the district court, a proceeding was had in the nature of a motion to compel the minor to answer interrogatories. In connection therewith, the guardian stipulated that " 'The only rights, if any, of . . . Johnny Howle, individually or through a representative, to enforce collection of or to receive payment from anyone of any part of the recovery and awards made in the January 30, 1973, judgment . . . are whatever rights are stated in said "Covenant Not to Execute", as limited by the provisions of said "Covenant Not to Execute".' "

The above stipulation was not authorized by the probate court and was an attempt to limit the child's rights.

■ Generally, a guardian may not waive legal rights on behalf of his ward, surrender or impair rights vested in the ward or impose any legal burden thereon. 39 Am. Jur.2d Guardian and Ward § 102, p. 86 (1968). There are exceptions to this rule which are not applicable to this case.

■ It is well-settled that a temporary guardian has only that power specifically granted him by the court. Tex.Prob.Code Ann. §§ 131, 133 (1956).

Under the facts and the applicable law the temporary guardian was not authorized to enter any such attempted stipulation; therefore, it is not binding upon the child.

Motion for rehearing overruled.