# Supreme Court of Texas

No. 22-0872

In re Illinois National Insurance Company, et al.,
*Relators*

On Petition for Writ of Mandamus

**Argued October 24, 2023**

JUSTICE BOYD delivered the opinion of the Court.

Justice Lehrmann, Justice Huddle, and Justice Young did not participate in the decision.

Liability insurance covers "damage the insured does to others." *Members Mut. Ins. Co. v. Hermann Hosp.*, 664 S.W.2d 325, 327 (Tex. 1984). When a person who has purchased liability insurance causes harm to another person, the insurance company must indemnify the insured person for any liability to the injured person within the insurance policy's coverage and limits. *See Pharr-San Juan-Alamo Indep. Sch. Dist. v. Tex. Pol. Subdivisions Prop./Cas. Joint Self Ins. Fund*, 642 S.W.3d 466, 471 (Tex. 2022). This mandamus action raises three issues regarding liability policies that often arise when the insured settles with the injured party—the underlying "claimant"—without the

insurer's participation or consent. First, if the settlement agreement does not require the insured to pay money and instead limits the claimant's recovery to any liability coverage available under the insurance policy, has the insured suffered a "loss" the policy covers? Second, can the claimant assert claims directly against the insurance company to recover the insurance benefits? And third, if the insured has suffered a loss, is the settlement agreement binding against the insurer or admissible as evidence to establish coverage or the amount of the loss?

We have addressed each of these issues previously in several cases, but this case requires us to provide additional clarification as we apply our prior holdings to these unique facts. Under these facts, we conclude (1) the insureds suffered a "loss" under the policies, (2) the claimants can assert claims directly against the insurers, and (3) the settlement is not binding or admissible in the coverage litigation. Because the trial court abused its discretion by holding otherwise on the third issue, we conditionally grant the requested mandamus relief in part.

## I.
## Background

In 2009, Cobalt International Energy partnered with three Angolan companies to explore and produce oil and gas off the coast of West Africa. A few years later, the federal Securities and Exchange Commission (SEC) announced it was investigating Cobalt for facilitating illegal payments to Angolan government officials. Around the same time, allegations arose that Cobalt had materially misrepresented the oil content of two of its exploratory wells. Publicity over these developments caused Cobalt's stock price to plummet, which

2

led Cobalt's investors to assert federal securities-fraud claims against Cobalt and its officers and directors.[1] The federal courts consolidated the claims and appointed GAMCO—a collection of investment funds that held Cobalt shares[2]—as lead plaintiff representing a class of 8,800 investors claiming over $1.6 billion in losses.

Before these events occurred, Cobalt purchased multiple levels or "towers" of liability insurance from numerous insurance companies.[3] Cobalt gave the Insurers notice of the SEC investigation and the well allegations before and when the shareholders filed suit, but the Insurers denied coverage, primarily asserting that Cobalt's notice was untimely and that certain policy provisions excluded the claims from coverage. The policies did not require the Insurers to provide Cobalt a defense against GAMCO's claims, but they did require the Insurers to advance defense costs "for which" the policies "provide coverage." Because the Insurers denied that their policies provided coverage, they refused to

---

[1] We will refer to Cobalt and its officers and directors collectively as "Cobalt" except when necessary to distinguish between them.

[2] We use GAMCO to refer to GAMCO Global Gold, Natural Resources & Income Trust and GAMCO Natural Resources, Gold & Income Trust.

[3] Among the insurers are the twelve Real Parties in Interest, which we refer to as the Insurers: Allied World National Assurance Company; Beazley Insurance Company, Incorporated; Endurance American Insurance Company; Federal Insurance Company; Freedom Specialty Insurance Company; Hudson Insurance Company; Illinois National Insurance Company; Pinnacle National Insurance Company FKA Alterra America Insurance Company; RSUI Indemnity Company; Starr Indemnity & Liability Company; Swiss Re Corporate Solutions America Insurance Corporation FKA North American Specialty Insurance Company; and Westchester Fire Insurance Company. Some of Cobalt's insurers settled with Cobalt before this mandamus proceeding and are not parties in this Court.

advance Cobalt's defense costs. Cobalt self-funded its defense and filed suit against the Insurers to recover those costs. Cobalt's officers and directors later intervened in that suit as plaintiffs, asserting the policies protected them as "insured persons."

In 2017, Cobalt filed for bankruptcy. GAMCO acknowledged that, as unsecured creditors, the securities class it represented was unlikely to recover anything from Cobalt's bankruptcy estate. Meanwhile, Cobalt's assets were depleted, its officers and directors were facing enormous personal liabilities, and the Insurers were refusing to provide coverage or pay for a defense. Both sides, in short, found reasons to begin settlement negotiations. The parties initially engaged in a mediation at which GAMCO demanded $175 million, but Cobalt was unable to accept without the Insurers' willingness to provide coverage to fund the settlement. Negotiations continued, however, and Cobalt updated the Insurers on the various offers and counters, but the Insurers continued to decline to participate.

After four years of extensive litigation for which Cobalt self-funded $25.5 million in defense costs, Cobalt and GAMCO ultimately executed a settlement agreement. The agreement recited a "Settlement Amount" of $220 million, which the parties believed represented the maximum amount of coverage potentially available under the Insurers' policies. Cobalt accepted an "obligation to satisfy" the Settlement Amount, but the parties agreed it would be "payable exclusively" from any insurance recoveries. The parties agreed that GAMCO would "pursue and prosecute on [Cobalt's] behalf" all of Cobalt's rights,

4

interests, claims, and coverage under the Insurers' policies, and that they would "fully cooperate with each other" in that litigation.

Cobalt had previously received $4.2 million from other liability insurers, and it agreed to deposit those funds into an escrow account. If the parties recovered any additional insurance benefits in the suit against the Insurers, they agreed they would immediately deposit those recoveries into the escrow account after paying certain amounts to the bankruptcy plan administrator. When the suit against the Insurers was finally resolved, Cobalt would receive up to $28.5 million of any recovered benefits, to reimburse the $25.5 million it spent in defense costs plus interest, and GAMCO would receive the rest on behalf of the class of claimants.

Although Cobalt agreed to allow GAMCO to control the coverage litigation, it expressly did not assign its insurance policies or coverage claims to GAMCO. Cobalt expressly disclaimed any representation or warranty regarding the recovery of any insurance benefits, and GAMCO expressly acknowledged that the Insurers denied coverage and agreed on behalf of all the claimants to "proceed with this Settlement at their own risk." Nevertheless, GAMCO agreed to release all claims against Cobalt and its officers and directors once the coverage litigation was finished, covenanted not to pursue any claims against them, and agreed to "look solely" to the Insurers and their policies to recover the $220 million Settlement Amount, regardless of whether any insurance benefits were ever recovered.

If Cobalt deposited the $4.2 million into the escrow account, fully cooperated in the coverage litigation, and ensured that any insurance

recoveries were paid into the escrow account and then disbursed as agreed, GAMCO agreed to accept Cobalt's performance under the agreement in "full settlement" of its claims. Cobalt and its officers and directors did not agree to pay any funds to GAMCO in exchange for the settlement and release, other than funds recovered through the coverage litigation. Upon final termination of the coverage litigation, GAMCO agreed to execute a full and final "Settlement Release." All parties denied any fault or liability and agreed that the settlement would not constitute an admission of wrongdoing by any party.

The parties recognized that the bankruptcy court and the federal court overseeing the securities class action would have to approve the settlement, and they agreed to jointly seek that approval. If the courts rejected the settlement, or if the agreement was otherwise terminated under its terms, the parties agreed they would "revert to their respective positions in the Action as of immediately prior to the execution of this Settlement Agreement." Both courts approved the settlement, however, incorporating it into the federal court's final judgment and into the bankruptcy court's reorganization plan. The bankruptcy plan preserved GAMCO's claims against Cobalt but expressly limited any recovery to available insurance benefits.

Although Cobalt notified the Insurers of the settlement agreement and the subsequent court proceedings, the Insurers did not appear, participate in, or lodge any objections to the settlement or to the resulting federal-court judgment and bankruptcy plan.

After the courts approved the settlement, GAMCO intervened in the coverage suit Cobalt had previously filed against the Insurers,

6

requesting a declaratory judgment that the Insurers are obligated to pay the $220 million Settlement Amount. Cobalt and its officers and directors likewise amended their pleadings to assert that the Insurers breached their contractual obligations by refusing to fund the Settlement Amount.

The Insurers filed a series of jurisdictional pleas and summary-judgment motions asserting (1) Cobalt and its officers and directors have not suffered a covered "loss" under the policies, (2) GAMCO lacks standing to sue the Insurers, and (3) alternatively, the settlement agreement is not binding on the Insurers or admissible to establish coverage or the amount of any covered loss. Cobalt and GAMCO responded with cross-motions asserting the opposite position on each point.

The trial court agreed with Cobalt and GAMCO, denied the Insurers' motions, refused to dismiss GAMCO, and held that Cobalt's defense costs and the settlement amount constitute a "loss" under the policies. The court further held that the settlement agreement is admissible in the coverage litigation, not subject to collateral attack, and may be relied on by the jury to establish the amount of Cobalt's loss, that the Insurers forfeited any defenses by denying coverage and defense costs, and that the bankruptcy plan and federal-court judgment approving the settlement were entitled to comity. The Insurers unsuccessfully sought mandamus relief in the court of appeals, ___ S.W.3d ___, 2022 WL 4553342, at *1 (Tex. App.—Houston [14th Dist.] 2022), and then filed for the same relief in this Court.

7

Mandamus relief is an extraordinary remedy available only on a showing that (1) the trial court clearly abused its discretion and (2) the party seeking relief lacks an adequate remedy on appeal. *See In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135–36, 138 (Tex. 2004) (orig. proceeding). We address both requirements, beginning with whether the Insurers have established that the trial court clearly abused its discretion.

## II.
## Abuse of Discretion

A trial court's "error of law" or "erroneous application of law to facts," we have said, "is always an abuse of discretion." *In re Facebook, Inc.*, 625 S.W.3d 80, 86 (Tex. 2021) (orig. proceeding). The Insurers contend here that the trial court made such errors and thus abused its discretion as to each of the three they raise. We address the trial court's legal conclusions on these issues de novo. *See id.*

### A.     "Legal obligation to pay"

In their first two issues, the Insurers contend the trial court clearly abused its discretion by holding that Cobalt suffered a "loss" and that GAMCO can sue the Insurers directly. Both of these arguments are ultimately premised on the Insurers' contention that, as a result of the settlement agreement, Cobalt has no "legal obligation to pay" anything to anyone. We agree that the resolution of both issues depends on the validity of that contention.

Specifically, on the question of whether Cobalt has suffered a loss, all of the insurance policies at issue require the Insurers to "pay on behalf of" Cobalt any "loss" Cobalt sustains during the coverage period up to the policy limits, and they define "loss" to mean damages,

8

judgments, settlements, defense costs, or other amounts for which Cobalt is "financially liable" or "legally obligated to pay."[4] To the extent Cobalt is seeking to recover from the Insurers any amount for which Cobalt is not "financially liable" or "legally obligated to pay," the Insurers simply have no duty to pay that amount as a matter of law. *See Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 77 S.W.3d 253, 261 (Tex. 2002) (explaining that an insurer is not "obligated to indemnify its insured for a third-party claim on which the insured is not liable").

Similarly, on the question of whether GAMCO can sue the Insurers, Texas law prohibits an injured party from directly suing the defendant's insurer unless and until "it has been established, by judgment or agreement, that the insured has a legal obligation to pay damages to the injured party." *State Farm Cnty. Mut. Ins. Co. of Tex. v. Ollis*, 768 S.W.2d 722, 723 (Tex. 1989) (per curiam).[5] Under this "no-

---

[4] Some policies also provide that "loss" does not include an amount for which the Insureds "are absolved from payment," but the Insurers do not contend that this means anything other than that they are *not* "financially liable" or "legally obligated to pay" such amounts.

[5] We originally announced this "no-direct-action rule" simply as the application of liability-policy provisions that expressly prohibited a direct action by a claimant unless the insured's obligation to pay the claimant or the amount of the insured's loss was determined by a final judgment against the insured or, in some policies, by a written agreement between the insured, the claimant, and the insurance company. *See Kuntz v. Spence*, 67 S.W.2d 254, 255 (Tex. Comm'n App. 1934, holdings approved); *cf. Great Am. Ins. Co. v. Murray*, 437 S.W.2d 264, 265 (Tex. 1969) (orig. proceeding); *Bluth v. Neeson*, 94 S.W.2d 407, 408 (Tex. 1936); *Seaton v. Pickens*, 87 S.W.2d 709, 710 (Tex. [Comm'n Op.] 1935); *Am. Indem. Co. v. Martin*, 84 S.W.2d 697, 698 (Tex. [Comm'n Op.] 1935); *see also Ohio Cas. Ins. Co. v. Time Warner Ent. Co., L.P.*, 244 S.W.3d 885, 888–89 (Tex. App.—Dallas 2008, pet. denied) ("The roots of the no-direct-action rule

direct-action rule," which prohibits declaratory-judgment claims as well as claims for monetary relief, GAMCO's claims against the Insurers "must fail unless" the settlement agreement or judgments incorporating it establish that Cobalt "is in fact liable" to GAMCO. *Essex Ins. Co.*, 450 S.W.3d at 526.

---

seem to lie in the no-action clause commonly found in liability insurance policies."); *Turner v. Cincinnati Ins. Co.*, 9 F.4th 300, 309 (5th Cir. 2021) ("The no-direct-action rule arises in part from the frequent usage of no-action clauses in insurance policies and the Texas courts' willingness to enforce such provisions."). In a few early cases, we based the rule on statutory provisions that imposed similar restrictions on particular types of insurance. *See Moxon v. Ray*, 81 S.W.2d 488, 489 (Tex. [Comm'n Op.] 1935); *Grasso v. Cannon Ball Motor Freight Lines*, 81 S.W.2d 482, 484–85 (Tex. [Comm'n Op.] 1935).

We later adopted the rule as a common-law "general rule" based on public-policy concerns, including the conflict of interest that arises when insurers must defend both themselves and their insureds and the prejudice that results when juries hear evidence of a defendant's insurance coverage. *See In re Essex Ins. Co.*, 450 S.W.3d 524, 526–27 (Tex. 2014) (per curiam) (orig. proceeding); *see also Angus Chem. Co. v. IMC Fertilizer, Inc.*, 939 S.W.2d 138, 138 (Tex. 1997) (per curiam) (recognizing the "general rule"); *Ohio Cas.*, 244 S.W.3d at 888–89 (explaining "public-policy basis for the rule"); *Landmark Am. Ins. Co. v. Eagle Supply & Mfg. L.P.*, 530 S.W.3d 761, 767 (Tex. App.—Eastland 2017, no pet.) (describing "public policy reasons" for the "general rule"); *Turner*, 9 F.4th at 309 ("Even beyond the inclusion of such language in contracts of insurance, there also is a public-policy reason against allowing a third-party plaintiff to sue an insured–defendant's insurer before liability has been established, as the lawsuit would create a conflict of interest for the insurer."). With regard to tort claims against an insured, we adopted formal procedural rules in the 1940s, expressly prohibiting claimants from joining liability and indemnity insurers as third parties unless the insurer "is by statute or contract liable to the person injured or damaged." TEX. R. CIV. P. 38(c), 51(b); *see Aviles v. Aguirre*, 292 S.W.3d 648, 649 (Tex. 2009) (addressing Rules 38(c) and 51(b)); *Penny v. Powell*, 347 S.W.2d 601, 603 (Tex. 1961) (same); *Langdeau v. Pittman*, 337 S.W.2d 343, 355 (Tex. Civ. App.—Austin 1960, writ ref'd n.r.e.) (same); *Serv. Mut. Ins. Co. of Tex. v. Erskine*, 169 S.W.2d 731, 734 (Tex. Civ. App.—Waco 1943, no writ) (applying Rule 38(c)).

Thus, to resolve both of the Insureds' first two issues—whether Cobalt suffered a "loss" and whether GAMCO can sue the Insurers directly—we must determine whether, in light of the settlement agreement and the judgments that incorporate it, Cobalt is "financially liable" in the sense that it is "legally obligated to pay damages" to GAMCO.

The Insurers contend that Cobalt is not "financially liable" or "legally obligated to pay" GAMCO anything at all. They note that in the settlement agreement, Cobalt denied any liability or wrongdoing and GAMCO released Cobalt from any liability and covenanted not to pursue any payment from Cobalt. GAMCO agreed to look solely to the insurance for any recovery and absolved and forever discharged Cobalt of any liability or payment obligation. In fact, instead of imposing a legal obligation to pay, the agreement gave Cobalt the right to receive any recovered insurance benefits up to $28.5 million to recover its defense costs. The federal-court judgment and bankruptcy plan, meanwhile, merely incorporated those settlement terms. As a result, the Insurers contend, Cobalt has no financial liability or obligation to pay and thus has no "loss," and GAMCO cannot sue the Insurers directly.

In response, Cobalt and GAMCO contend Cobalt was legally obligated to pay the $4.2 million in insurance benefits it had previously received and remains legally obligated to pay any additional benefits it receives as a result of the coverage litigation against the Insurers. In addition, Cobalt is legally obligated to fully cooperate in the litigation to

11

recover those benefits, at its own expense,[6] and GAMCO's claims against Cobalt are not released until that litigation is terminated.

Whether an insurer has a duty to indemnify its insured depends on the "facts actually established in the underlying suit." *Burlington N. & Santa Fe Ry. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 334 S.W.3d 217, 219 (Tex. 2011).[7] But as we recently reaffirmed, whether the insured has a legal obligation to pay an injured party may be established through a *settlement* of the underlying suit. *See In re Farmers Tex. Cnty. Mut. Ins. Co.*, 621 S.W.3d 261, 270–71 (Tex. 2021) (orig. proceeding) ("Texas courts recognize that an insured can become legally responsible due to a settlement.").[8] Whether it is so established,

---

[6] Cobalt also contends, and the Insurers appear to agree, that Cobalt sustained a "loss" by self-funding its defense against GAMCO's claim. The Insurers do not concede that the policies cover that loss and observe that this relatively small $25.5 million claim (compared to the $220 million) exists only against one of the many Insurers and requires a "much simpler trial" to resolve. We note that although the defense costs constitute a "loss" for which Cobalt may pursue a claim, they do not support GAMCO's right to sue the Insurers under the no-direct-action rule because Cobalt was not legally obligated to pay the $25.5 million *to GAMCO. See Ollis*, 768 S.W.2d at 723. But because we conclude that Cobalt is legally obligated to pay any and all insurance recoveries to GAMCO, we need not resolve the case on that ground.

[7] *See also D.R. Horton-Tex., Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740, 744 (Tex. 2009) ("The insurer's duty to indemnify depends on the facts proven and whether the damages caused by the actions or omissions proven are covered by the terms of the policy."); *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 490 (Tex. 2008) ("[T]he facts actually established in the underlying suit determine whether the insurer must indemnify its insured.").

[8] *See also Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 189 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("A legal obligation can also arise out of a contract, such as a settlement."); *Tex. Prop. & Cas. Ins. Guar. Ass'n v. Boy Scouts of Am.*, 947 S.W.2d 682, 691 (Tex. App.—Austin 1997, no pet.) ("A legal obligation can also arise out of a contract, such

however, depends on the settlement terms. *Id.* The Insurers contend the settlement agreement here did not impose a legal obligation to pay because Cobalt expressly denied any liability, the agreement did not obligate Cobalt to pay any of its own funds to GAMCO, GAMCO covenanted not to enforce any obligation to pay under the settlement or judgment, and GAMCO agreed to release Cobalt from all liability. We are unconvinced.

First, we do not agree that Cobalt's denial of liability or wrongdoing in the settlement agreement relieves it of any legal obligation to pay. A settling insured need not admit to wrongdoing or concede legal liability to accept a legal obligation to pay under a settlement agreement. *See Farmers Tex. Cnty. Mut.*, 621 S.W.3d at 271 n.6 (rejecting contention that a settlement creates a legal obligation "only if the insured admits to facts that would establish fault in the settlement agreement"). The "legal obligation to pay" on the claims asserted in the underlying litigation is created by the insured's contractual agreement to pay those claims, regardless of whether the insured admits to wrongdoing or liability. *Tex. Prop. & Cas. Ins.*, 947 S.W.2d at 691 (holding insured's statement in settlement agreement

as a settlement."); *HM Int'l, L.L.C. v. Twin City Fire Ins. Co.*, 13 F.4th 356, 360 (5th Cir. 2021) ("[U]nder Texas law, 'legally liable to pay' can mean a contractual obligation to pay."). As we explained in *Farmers Texas County Mutual*, other policy provisions may, of course, "require the insurer's consent to the settlement for coverage to apply," *Farmers Tex. Cnty. Mut.*, 621 S.W.3d at 271 n.4, and the policy may present "other legal grounds that may prevent an insurer from being obligated to pay a settlement," *id.* at 272. The Insurers have not raised any such grounds in this case, however, so we address only the question they have presented, whether Cobalt is legally obligated to pay as a result of the settlement agreement and judgments incorporating it.

"that it was not legally obligated to pay the . . . claim does not establish that the . . . settlement was not a covered claim under the [insurance] policy").

Nor do we agree that the lack of any obligation that Cobalt actually pay funds *from its own pockets* relieves Cobalt of any "legal obligation to pay" under the settlement agreement. The policies at issue are assets that belong to Cobalt. *See Great Am. Ins. Co. v. Hamel*, 525 S.W.3d 655, 667 (Tex. 2017) (referring to liability policy as insured's "asset"); *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994) (same). And the policies are "pay on behalf of"—or "liability" policies— as opposed to true "indemnity" policies. In an indemnity policy, the insurer agrees only to *reimburse* the insured for amounts within the policy limits that the insured *has actually paid* to fulfill a legal obligation. *Young Men's Christian Ass'n of Metro. Fort Worth v. Com. Standard Ins. Co.*, 552 S.W.2d 497, 504 (Tex. App.—Fort Worth 1977, writ ref'd n.r.e.).[9] By contrast, in a liability policy the insurer agrees to pay "on behalf of" the insured amounts within policy limits that the insured is legally obligated to pay. *Id.* Under a liability or pay-on-behalf-of policy, the insurer's obligation to pay benefits arises when the insured becomes legally obligated to pay the injured party, regardless of whether

---

[9] *See also Yorkshire Ins. Co. v. Seger*, 279 S.W.3d 755, 770–71, 770 n.22 (Tex. App.—Amarillo 2007, pet. denied) ("[A]n indemnity policy provides that the insurer's liability does not attach unless the judgment against the insured has actually been paid."); *Conoco, Inc. v. Republic Ins. Co.*, 819 F.2d 120, 122 (5th Cir. 1987) ("In an indemnity contract, . . . the insurer agrees to reimburse expenses to the insured that the insured is liable to pay and has paid." (quoting *Cont'l Oil Co. v. Bonanza Corp.*, 677 F.2d 455, 459 (5th Cir. 1982))).

14

the insured has actually paid. *Id.*[10] The policies at issue here are liability policies, requiring the Insurers to "pay on behalf of" Cobalt amounts within the policy limits that Cobalt becomes legally obligated to pay, regardless of whether Cobalt ever actually pays out of its own coffers first.

For the same reason, we reject the Insurers' contention that GAMCO's covenant not to execute on the judgment or attempt to collect any additional funds from Cobalt prevents Cobalt from having a legal obligation to pay under the settlement agreement. Because the insured under a liability policy is not required to pay the obligation before the insurer is obligated to pay, a covenant not to execute on a judgment does not relieve the insurer of liability for paying that judgment within the policy limits. *See Young Men's Christian Ass'n*, 552 S.W.2d at 505 ("A covenant not to execute is certainly not a satisfaction, nor is it the same as a release. Its legal effect is similar to a covenant not to sue, in that it does not extinguish the plaintiff's cause of action and does not operate

---

[10] *See also Yorkshire*, 279 S.W.3d at 771 n.22 ("[T]he insured is not required to pay the obligation before the insurer is required to pay. If a judgment is rendered against the insured, the insurer's liability to pay attaches at that time."); *Home Owners Mgmt. Enters., Inc. v. Mid-Continent Cas. Co.*, 294 F. App'x 814, 817 (5th Cir. 2008) ("[U]nlike under an indemnity policy, [the insured] did not have to pay the judgment in order to trigger [the insurer's] duty to indemnify."); *First Nat'l Bank of Louisville v. Lustig*, 975 F.2d 1165, 1166–67 (5th Cir. 1992) ("[U]nder a liability policy a cause of action accrues when liability attaches, whereas under an indemnification policy there is no cause of action until the liability has been discharged, as by payment of the judgment by the insured." (quoting *Quinlan v. Liberty Bank & Tr. Co.*, 575 So. 2d 336, 355 (La. 1990))); *Conoco*, 819 F.2d at 122 ("In a liability contract, the insurer agrees to cover *liability* for damages. If the insured is liable, the insurance company must pay the damages." (quoting *Cont'l Oil*, 677 F.2d at 459)).

to release other joint tortfeasors." (quoting *Rager v. Superior Coach Sales & Serv. of Ariz.*, 516 P.2d 324, 327 (Ariz. 1973))).[11]

The fact that GAMCO agreed to release Cobalt from any liability, however, requires a slightly more complicated analysis. In *Ollis*, an older per curiam opinion, we held that a settlement agreement in which the insured paid money to "buy peace" and obtain a release from the injured party without agreeing to "pay damages" or admit liability did not establish that the insured was "obligated to pay damages" or entitled "to payment under the insurance policy." 768 S.W.2d at 723. And in *Angus Chemical*, another older per curiam decision, we stated that "a release of the [insured] that precludes a final determination of liability by agreement or judgment . . . precludes the [injured] party from suing the tortfeasor's insurer" because "the release precludes the prerequisite determination of [the insured's] liability." 939 S.W.2d at 138–39. Yet we also said in *Angus Chemical* that, even after the injured party releases the insured, the insurer may still be obligated under the policy. *See id.* (holding that a release against the insured does

---

[11] *See also Horton v. State Dep't of Ins. Receiver J. Robert Hunter*, 905 S.W.2d 59, 63 (Tex. App.—Austin 1995, no writ) ("[T]he fact that [the insured] will not have to pay any damages does not eradicate the insurer's . . . duty to pay."); *Ard v. Gemini Expl. Co.*, 894 S.W.2d 11, 15 (Tex. App.—Houston [14th Dist.] 1994, pet. denied) (same); *Brodhead v. Dodgin*, 824 S.W.2d 616, 621 (Tex. App.—Austin 1991, writ denied) (same); *Whatley v. City of Dallas*, 758 S.W.2d 301, 309 (Tex. App.—Dallas 1988, writ denied) ("As a rule, a claimant who covenants not to enforce any judgment he might obtain against an insured individually does not release the insurer who has wrongfully refused to defend its insured from liability within policy limits."); *Yorkshire*, 279 S.W.3d at 770–71 (holding corporate insured's dissolution and inability "to pay the damages awarded in the underlying judgment does not affect [its] *liability* under the judgment").

not preclude suit in jurisdictions that allow for direct actions against insurers without a prior determination of the insured's liability).

We have further expounded on these issues, however, since our opinions in *Ollis* and *Angus Chemical*. In *D.R. Horton-Texas*, for example, we explained that when the injured party's claims against the insured are "resolved before a trial on the merits" pursuant to an agreement that prevents an "opportunity to develop the evidence" needed to "establish or refute an insurer's duty to indemnify," that issue may be resolved in a subsequent coverage action against the insurer. 300 S.W.3d at 744. Despite the pretrial resolution of the underlying liability action, the "insurer and the putative insured may introduce evidence in coverage litigation to establish or refute the insurer's duty to indemnify." *Id.* at 745.

Most recently, we held in *Farmers Texas County Mutual* that a settlement agreement in which the insured agreed to pay money to "buy peace" while expressly denying any "liability" in exchange for the injured party's "release" of all claims "establishes that [the insured] was 'legally responsible' for damages." 621 S.W.3d at 271. We thus agreed that the insured could pursue her coverage claim against the insurer to recover "amounts she was legally responsible to pay under the settlement." *Id.* at 264. While acknowledging that "other legal grounds"—an unsatisfied requirement that the insurer consent to the settlement, other "coverage" issues, or the "reasonableness of the settlement amount"—might "prevent an insurer from being obligated to pay a settlement," *id.* at 264, 271 n.4, 272, the settlement agreement—even with a complete release and no admission of fault or liability—

established that the insured was "legally responsible" to pay, *id.* at 271. The settlement may have prevented the establishment of facts necessary to prove coverage, we explained, but "those facts are not required to be proven in an underlying trial against the insured and are often proven in coverage litigation." *Id.* at 276. Although the settlement may not have established all those necessary facts, it did "legally obligate" the insured "to pay damages." *Id.*

Applying these principles here, we conclude the settlement made Cobalt "legally obligated to pay" GAMCO. The settlement legally obligates Cobalt to pay to GAMCO, through the escrow account, both the previously recovered insurance benefits and any benefits it recovers from the Insurers through the coverage litigation. As the insured under these pay-on-behalf-of policies, Cobalt holds these benefits as its own assets and need not pay first from its own funds to receive them. And if Cobalt fails to fulfill its obligations to pursue and deliver any recoverable benefits, GAMCO's release will not become effective. The federal court's judgment incorporating the settlement agreement requires the same: that Cobalt pay to GAMCO any recovery in the coverage litigation and, until then, the claim releases are not effective.

Because the settlement agreement establishes that Cobalt is legally obligated to pay and is "in fact liable" to GAMCO for any recoverable insurance benefits, Cobalt has suffered a "loss" under the policies and the no-direct-action rule does not prevent GAMCO from suing the Insurers directly. *See Essex Ins. Co.*, 450 S.W.3d at 526; *Great Am. Ins. Co.*, 437 S.W.2d at 265. The trial court therefore did not clearly abuse its discretion by denying the Insurers' summary-judgment

18

motions on these issues, and we decline to grant mandamus relief on this ground.

## B.  The settlement's effect on the coverage litigation

We now turn to the third issue: whether the settlement agreement is binding against the Insurers and admissible in the coverage litigation to establish coverage and the amount of Cobalt's loss.[12] Because the settlement did not result from a "fully adversarial trial," we conclude it is not.

As we observed long ago, "one who agrees to indemnify against loss should not be required to pay more than what is actually lost." *Hernandez v. Great Am. Ins. Co. of N.Y.*, 464 S.W.2d 91, 93–94 (Tex. 1971). Based on this principle, we have held that a settlement between an insured and an injured party is not binding on the liability insurer if it was "rendered without a fully adversarial trial." *State Farm Fire &*

---

[12] Relying on Texas Rule of Appellate Procedure 55.2(f), Cobalt argues that the Insurers did not preserve this argument because they did not raise it in their mandamus petition in the court of appeals. Rule 55.2(f) prohibits a "petitioner" from raising in its "brief on the merits" any "additional issues or points or chang[ing] the substance of the issues or points presented in the petition." TEX. R. APP. P. 55.2(f). This rule governs briefs on the merits in appeals, and its reference to the "petition" refers to a petition for review, not a petition for writ of mandamus. *See* TEX. R. APP. P. 55.2(f). The comparable rule for mandamus petitions does not contain the same language, because mandamus proceedings are original proceedings and are not subject to the same preservation and presentation requirements as appeals. *See* TEX. R. APP. P. 52.3(f); *In re AIU Ins. Co.*, 148 S.W.3d 109, 121 (Tex. 2004) (orig. proceeding) ("While it is certainly the better practice to present all arguments to a court of appeals before seeking mandamus in this Court, the failure to do so is not a failure to preserve error as it ordinarily would be in an appeal."). We will thus consider the Insurers' arguments on this issue.

*Cas. Co. v. Gandy*, 925 S.W.2d 696, 714 (Tex. 1996). In determining whether a settlement resulted from a "fully adversarial trial,"

> the controlling factor is whether, at the time of the underlying trial or settlement, the insured bore an actual risk of liability for the damages awarded or agreed upon, or had some other meaningful incentive to ensure that the judgment or settlement accurately reflects the plaintiff's damages and thus the defendant–insured's covered liability loss.

*Hamel*, 525 S.W.3d at 666. Without such a "meaningful incentive," the resolution of the underlying suit becomes "a mere formality—a pass-through trial aimed not at obtaining a judgment reflective of the [injured party's] loss, but instead at obtaining a potentially inflated judgment to enforce against [the insurer]." *Id.* at 667.

We agree with the Insureds that Cobalt lacked the necessary "meaningful incentive" in connection with this settlement agreement. We do not doubt that Cobalt vigorously litigated against GAMCO's claims and entered into the settlement agreement in good faith and without engaging in improper collusion with GAMCO. But the terms of the settlement agreement protected Cobalt against any "actual risk of liability" beyond its obligation to pay insurance benefits it may or may not receive.

As in *Hamel*, the settlement agreement here "eliminated any meaningful incentive" because GAMCO "agreed not to enforce any resulting judgment" and "not to pursue" Cobalt's non-insurance assets, leaving only the insurance policies "as a potential source to satisfy any judgment obtained." *Id.* at 666–67. Although, as we have held, the settlement legally obligated Cobalt to pursue the policy benefits and pay

20

any received to GAMCO, Cobalt would have "no stake in the outcome" of the coverage litigation "and thus no meaningful incentive to defend itself" as to liability to GAMCO or to minimize the amount of GAMCO's damages. *Id.* at 667. In fact, the settlement agreement did not fix GAMCO's damages to any amount, but merely set the amount to the maximum amount of insurance proceeds that could possibly be obtained. The settlement amount of $220 million was directly and explicitly tied to the value of the insurance policies, not to any loss GAMCO may have suffered.[13]

Cobalt has pointed to no facts or terms to establish that it retained a meaningful incentive and thus overcome the "strong presumption that" the settlement "did not result from an adversarial proceeding." *Id.* at 668. In its cross-motion for summary judgment on this issue, it argued (and the trial court agreed) that the Insurers "abandoned" their right to challenge the settlement because they refused to advance defense costs, participate in the settlement negotiations, or respond to GAMCO's settlement demands. But the requirement that a settlement or judgment result from a "fully adversarial" proceeding applies even when the insurer "neither accepted

---

[13] We are aware, of course, that GAMCO represented a class of plaintiffs that collectively alleged damages exceeding $1.6 billion, several times greater than the $220 million potentially available under the insurance policies. Cobalt certainly may have considered that the amount of damages was not worth fighting over because it would at least exceed the available insurance benefits. But Cobalt could not deprive the Insurers of the opportunity to disagree by simply caving on the issue. Whether the Insurers can in fact prevent or limit any recovery to something less than the total policy limits will be determined in the coverage litigation.

coverage nor made a good-faith effort to adjudicate coverage." *Hamel*, 525 S.W.3d at 664.

Cobalt relies on *Evanston Insurance Co. v. ATOFINA Petrochemicals, Inc.*, in which we held that an insurer who wrongly denied coverage was barred from collaterally attacking the settlement amount. 256 S.W.3d 660, 674 (Tex. 2008). But we specifically noted in *ATOFINA* that the settlement there did not raise the same concerns as those raised in *Gandy* because "ATOFINA settled without knowing whether or not it would be covered by the policy, leaving in place its motive to minimize the settlement amount in case it became solely responsible for payment." *Id.* As we noted in *Hamel*, our holding in that case was not inconsistent with *ATOFINA* because the insured party in *ATOFINA* "retained the risk that he would be liable for the damages," and that "incentive to contest the plaintiffs' alleged damages was sufficient to ensure that the settlements accurately reflected the insured's covered loss." 525 S.W.3d at 666; *see also HM Int'l*, 13 F.4th at 361 ("The possibility of being liable for damages or the settlement if the insurer does not ultimately cover it is an adequate incentive to make such a settlement adversarial."). That incentive is missing here.

Cobalt also argues (and the trial court also agreed) that principles of comity mandate that the trial court give full faith and credit to the federal court and the bankruptcy court's findings that the settlement agreement was fair, reasonable, and made at arm's-length. "[I]t is appropriate for courts to apply the comity doctrine where another court has exercised jurisdiction over the matter and where the states agree about the public policy at issue." *Bryant v. United Shortline Inc.*

22

*Assurance Servs., N.A.*, 972 S.W.2d 26, 30 (Tex. 1998). But the federal court and the bankruptcy court did not find that the settlement agreement resulted from a fully adversarial proceeding or that the Settlement Amount represented a fair appraisal of GAMCO's damages. Holding that the settlement agreement may not bind the insurers to the Settlement Amount does not violate comity principles.

In granting Cobalt's cross-motion for partial summary judgment and denying the Insurers' motion, the trial court rejected the Insurers' defense that the settlement agreement is not binding or admissible to establish coverage or the amount of Cobalt's loss. Because these facts conclusively establish that the settlement agreement did not result from a fully adversarial proceeding, this was a clear abuse of discretion.

### III.
### Adequate Remedy

Having determined that the trial court abused its discretion on the third issue, we must now determine whether the Insurers have demonstrated they have no adequate remedy by appeal. *See Walker v. Packer*, 827 S.W.2d 833, 842 (Tex. 1992) (orig. proceeding). Generally, mandamus relief is "unavailable when a trial court denies summary judgment, no matter how meritorious the motion." *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 465 (Tex. 2008) (orig. proceeding).

But some extraordinary circumstances will warrant mandamus relief. *See In re Acad., Ltd.*, 625 S.W.3d 19, 32 (Tex. 2021) (orig. proceeding); *In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 314 (Tex. 2010) (orig. proceeding). When "the very act of proceeding to trial— regardless of the outcome—would defeat the substantive right involved" or would cause a knowing waste of resources, mandamus relief may be

23

necessary. *See McAllen Med. Ctr.*, 275 S.W.3d at 465–66 ("Sitting on our hands while unnecessary costs mount up contributes to public complaints that the civil justice system is expensive and outmoded."); *Prudential*, 148 S.W.3d at 137 (stating that in some circumstances "the irreversible waste of judicial and public resources that would be required" absent mandamus relief justifies granting such relief (quoting *In re Masonite Corp.*, 997 S.W.2d 194, 198 (Tex. 1999) (orig. proceeding)). And the same is true when the order being challenged "severely compromised" and "effectively foreclose[d]" the defendant's ability to present a defense. *In re Chefs' Produce of Hous., Inc.*, 667 S.W.3d 297, 303 (Tex. 2023) (orig. proceeding).

We conclude this case presents such extraordinary circumstances. Under the trial court's rulings, Cobalt and GAMCO may pursue their coverage claims against the Insurers and the Insurers will not be permitted to challenge their liability for the full Settlement Amount set forth in the settlement agreement. But as a matter of law, the settlement agreement is not binding on the Insurers or admissible to establish coverage or the amount of Cobalt's loss, so the trial as currently ordered would be a complete waste of the courts' and parties' resources. We thus conclude that the Insurers are entitled to mandamus relief regarding the effect of the settlement agreement.

## IV.
## Conclusion

We conditionally grant the Insurers' petition for writ of mandamus in part and order the trial court to vacate its January 19, 2023 orders to the extent they rely on the holding that the settlement agreement is admissible and binding to establish coverage under the

24

policies and the amount of any covered loss. Our writ will issue only if the trial court fails to comply.

_____

Jeffrey S. Boyd
Justice

**OPINION DELIVERED:** February 23, 2024